(No. 62795.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MANUEL SALAZAR, Appellant.

*Opinion filed November 21, 1988.—Rehearing denied April 3, 1989.*

428

430

CLARK, J., joined by STAMOS, J., dissenting.

Michael D. Ettinger and Barry S. Pechter, of Ettinger & Pechter, Ltd., of Oak Lawn, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Shawn Denney, Solicitor General, and Terence M. Madsen and Marcia L. Friedl, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

On April 10, 1985, a bill of indictment was filed charging defendant, Manuel Salazar, with the murder of a police officer, Martin Murrin, while Officer Murrin was in the course of performing his official duties on September 12, 1984. (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (b)(1).) Subsequent to a change of venue from Will County to McLean County, a jury found defendant guilty of murder. Pursuant to section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) (hereafter referred to as the death penalty statute), a death penalty hearing was held before the same jury (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d)(1)). The jury unanimously found that defendant had attained the age of 18 or more, that statutory aggravating factors existed and that no mitigating factors existed to preclude the imposition of the death sentence. Defendant was sentenced to death. The sentence was stayed pursuant to Supreme Court Rule 609(a) pending appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d Rules 609(a), 603). This court will address in full all the evidence in this case as it applies to each issue.

## I

Defendant argues that he was denied equal protection of the law when the circuit court transferred the cause from Will County to McLean County, resulting in the alleged exclusion of blacks and persons of Spanish origin from the jury venire. Citing *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, defendant specifically argues that he is entitled to an impartial jury drawn from a cross-section of the community.

In *Taylor*, the United States Supreme Court held that the systematic exclusion of women from sitting on juries violates a defendant's sixth amendment right to have a jury chosen from a fair cross-section of the community. In this case, however, defendant's argument does not involve whether a systematic exclusion of a particular race or ethnic group has occurred, but in actuality whether a lack of a jury chosen from a fair cross-section of a community equal to the community where the crime was committed and from whence this cause was transferred has denied defendant equal protection. This court effectively addressed the issue in *People v. Johnson* (1986), 114 Ill. 2d 170. This court held:

> "This is not a case involving the systematic exclusion of 'a "distinctive" group in the community' [citation], which would trigger a fair–cross-section inquiry under the standard recently announced by the Supreme Court in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Nor are we familiar with any constitutional right allowing a defendant to select his own place of trial. [Citation.] To require that the venire of the transferee county proportionately mirror any distinctive groups found in the originating county would either saddle our judiciary with an onerous, if not impossible, task or effectively grant defendants a heretofore unrecognized right to choose their place of trial." 114 Ill. 2d at 180-81.

The facts in this case are similar to those in *Johnson*. Defendant in this case was indicted in the circuit court of the Twelfth Judicial Circuit, Will County. On July 29, 1985, the People raised the issue of change of venue because in previous conversations with defendant's out-of-State counsel, the People were under the impression that defense counsel thought that the case had been transferred from Will County to Kankakee County as a matter of law. However, the People had not received any motion regarding the matter. The local defense counsel confirmed the People's statements. The trial court at this point stated that it did not know if the case would be transferred to Kankakee County because it did not believe that the "climate" would be beneficial to defendant based on previous experiences in that county. The court later expressed concern about transferring the case to Kankakee or Iroquois County and suggested the possibility of Rockford or "someplace like that." Local counsel agreed.

On August 2, 1985, the local defense counsel officially gave notice to the court and the People that it would be filing a motion to change venue in three weeks. Defendant filed his motion for change of venue on August 29, 1985, and on the same date the court held a hearing on the motion. The court granted defendant's motion but reserved its ruling regarding the naming of the situs of the trial. The court also expressed some reservations regarding other areas within the circuit and stated that it would confer with the chief judge regarding the arrangements. Defense counsel expressed no objections to Cook County, but the court stated that it would not be Cook County and possibly would be Peoria or Bloomington or "something like that."

On September 17, 1985, the court filed its written orders transferring the case from Will County to McLean

County for trial commencing on November 4, 1985. At the October 18 hearing, the out-of-State defense counsel expressed concern regarding the place of venue because of his need to be near an airport in light of the fact that he was coming from California. The court assured him that Bloomington in McLean County had a substantial airport. Defense counsel stated that if he had any more objections to venue he would submit a written motion. Defense counsel then expressed concern over the selection of jurors in McLean County. The court noted that it had filed its order for change of venue on September 12, 1985, and that defense counsel had waited until October 18, 1985, to express concern. The court told defense counsel that the motion had to be filed very soon because five weeks had passed.

On November 4, 1985, the date of the start of the trial, defense counsel filed a motion to discharge the jury and transfer this case to another county because .82% of the McLean County population is of Hispanic origin and 5% is of black and Hispanic origin, whereas the county of the incident is 4% of Hispanic origin and 14% of black and Hispanic origin. Defendant alleged that Spanish and black persons were being systematically excluded from the available jury pool. Prior to jury selection the court held a hearing on the motion. The trial court denied defense counsel's motion.

This court finds that defense counsel was attempting to force the circuit court to pick a venue favorable to defendant or to defendant's liking. This court does not recognize a right on behalf of a defendant to choose venue. As illustrated in this case, a defendant could continue to object to venue until a favorable situs has been found. The circuit court has discretion to choose the proper venue, and this court finds that the court did not abuse its discretion. The circuit court considered the amount of pretrial publicity, the other counties in the cir-

cuit, and the out-of-State defense counsel's concern for an airport and appropriately chose McLean County. Thus, this court finds that the circuit court did not abuse its discretion.

## II

Defendant argues that the People failed to prove beyond a reasonable doubt defendant's guilt. Defendant specifically argues that the People failed to prove that defendant had the requisite mental state, *i.e.*, that he intentionally killed Officer Murrin. The evidence reveals otherwise.

Officer Thomas Ponce stated that on September 12, 1984, at approximately 5 p.m., he and the deceased were patrolling in full uniform in the northeast section of Joliet. They were traveling in a marked police squad car. As they were traveling eastbound on Woodruff Avenue and were approaching the intersection of Draper Avenue, they observed a green, full-size, four-door car with a group of male Spanish subjects and a male black traveling on Draper Avenue toward Woodruff. Officer Ponce pointed out the car to Officer Murrin. Officer Murrin then told Officer Ponce to continue driving eastbound on Woodruff as Officer Murrin maintained observation of the vehicle. As they passed the vehicle, Officer Murrin instructed Officer Ponce to turn the squad car around as they both continued to keep the green car in their sight. After Officer Ponce made the U-turn, the car under observation was coming toward the squad car. At that time, the car stopped and a black male subject and a Spanish male subject exited the car and began running away from the car. The Spanish subject held a red bag in his hand. Officer Ponce drove the car into a vacant lot which defendant ran across. Officer Murrin then instructed Officer Ponce to "cut him [defendant] off," pointing toward Antram Avenue. Officer Murrin exited

the squad car and began pursuit of defendant on foot. About two minutes later during Officer Ponce's attempt to locate his partner or defendant, Ponce heard five gunshots. Eventually, he saw defendant in the rear of a residence. Officer Ponce exited the squad car and yelled, "Halt, police." Defendant looked over his right shoulder at Officer Ponce and then ran off. Although Officer Ponce observed defendant holding a gun at a 45-degree angle, he did not fire at defendant because the distance was too far. He only observed that defendant was carrying a handgun and that defendant did not have any debris or blood on him. Officer Ponce at that time did not observe anything unusual about the right side of defendant's face. Soon afterwards, Officer Ponce found Officer Murrin, who was bleeding from the chest area, and immediately radioed for help.

Officer Ponce also stated that a week prior to this offense he and the deceased had had a discussion regarding a "wanted" flyer on defendant. The deceased had directed Officer Ponce's attention to the flyer and told him that he was going to find defendant later during patrol. The wanted flyer contained the nature of the charge and a picture of the suspect.

Willie Pitts, who lives at 1029 Antram Avenue, overheard part of the scuffle between defendant and the deceased. Pitts was working on his car in his backyard when he heard the sound of "fast running feet." At that time, he came out from under the hood of his car and looked to his right but saw nothing. When he looked to his left, he saw a young man (defendant) running down the alley with a police officer following in pursuit. Pitts observed that the officer had a gun in his right hand and that defendant was carrying a plastic bag in his left hand. Pitts stated that the young man (defendant) was Hispanic or Mexican. A few seconds later he heard someone say, "Stop fighting, damn it. I got you. You are

under arrest," and then he heard three quick gunshots followed by a pause and two more gunshots. Later he saw defendant come back down the alley and up on the hill behind his house. Pitts saw defendant vault one of the neighbors' fences while holding a gun in his right hand. He then saw defendant come back over the fence without the gun. Pitts stated that the left side of defendant's face did not have any unusual markings, blood or bruises. Pitts did not identify defendant as the young man he saw on the day of the offense. During cross-examination, defense counsel unsuccessfully attempted to sway Pitts regarding his prior statements.

To impeach Pitts, defendant presented Robert Brenczewski, a police officer for 14 years and an investigator for six of those years with the City of Joliet police department. Officer Brenczewski had taken statements from various witnesses, including Pitts, on September 12, 1984. Between 5:30 and 6 p.m. that day, he had spoken with Willie Pitts in Pitts' backyard.

Officer Brenczewski stated that Pitts told him that he first heard someone yell and then saw a male Mexican subject run by him. At that time, Pitts was working on his car in his backyard at 1029 Antram. Pitts was 6 to 12 feet from the alleyway. Pitts stated that he first heard a subject yell something to the effect, "Halt. I got you, God damn it. Freeze," and then saw a male Mexican wearing a red or maroon T-shirt with no collar and with black hair run past him. About 30 to 40 feet behind the male Mexican subject was a police officer with his gun drawn. Pitts heard the officer order the subject to halt and heard the officer yell, "Freeze. I got you." About 30 to 40 seconds later, Pitts heard a type of talking which he could not make out. Pitts did not tell Officer Brenczewski that he heard "Quit fighting" or "You are under arrest." When Pitts first saw the male Mexican subject running down the alleyway, he saw the sub-

ject carrying a plastic bag in his hand. Pitts told Officer Brenczewski that he was unsure of the exact color of the bag.

Pedro Palacios, a friend of defendant, was at his parents' house on September 12, 1985, working outside on his father's car when his brother David Palacios came up to him and told him that defendant was in the garage. Pedro stated that he then stopped what he was doing, went in the garage, and saw defendant putting on his brother David's clothes. Pedro saw that one of defendant's legs had a barbed wire cut on it and that defendant's face was "puffed up" on the right side. Pedro did not observe any blood by the eye and only a little blood on the leg which had been cut. Pedro did not see any other injuries on defendant but he did have a problem recognizing defendant at first. Defendant eventually told Pedro that he had just shot a cop. Pedro, David and defendant went downstairs into the basement to decide what to do next.

Defendant told the Palacios brothers that he had been chased by a cop. During the chase, defendant was carrying a bag with a 9 millimeter gun in it which he tossed. When the officer yelled "Freeze," defendant stopped and began to give himself up but the officer started to hit him repeatedly. When defendant could not take it anymore, defendant reached for the officer's gun. Defendant fired once and saw the officer turn around, say, "Oh, my God," and then defendant fired the rest of the shots.

At this point in the trial, the People introduced into evidence Pedro's taped statements pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1) as a prior inconsistent statement. The People argued that Pedro's prior taped statements to the police were inconsistent with his testimony at trial. Detective Terrence Mazur, an officer

with the City of Joliet police department for 11½ years, took Pedro's statements on September 15 and 17, 1984. Defense counsel objected and the court allowed an offer of proof outside the presence and hearing of the jury.

During the offer of proof, both of Pedro's tape-recorded statements were played. Pedro stated that the tapes were accurate and that nothing had been added or deleted on the tapes. Pedro stated that the second statement was taken to clarify when defendant threw his gym bag away. Regarding the first statement, Pedro stated that Officer Mazur interviewed him for two hours and suggested things for him to say on the tape. Regarding the second statement, Pedro stated that during the recording Officer Mazur had turned off the tape recorder several times and questioned him regarding defendant's taking the gun out of Officer Murrin's holster. However, Pedro admitted at trial that Officer Mazur did not threaten him in any way, but that Officer Mazur told him that if he were lying, he would arrest him and "throw the book at him."

At the close of the offer of proof, the court allowed the People to question Pedro regarding his taped statements in the presence of the jury. Upon continuing direct examination regarding his second taped statement, Pedro admitted that he told Officer Mazur that defendant informed Pedro that he threw the gym bag away after he shot the officer. Under cross-examination Pedro stated that defendant told him that he threw the bag away before he came to the fenced-in area at the end of the alleyway and before his encounter with the deceased. Defendant also told Pedro that when he could not take the officer's hitting him anymore, he reached for the officer's gun. Pedro stated that Officer Mazur told him defendant reached for the gun, not vice versa. Pedro also stated that Officer Mazur suggested to him that

defendant kept shooting the gun into the deceased's body.

During redirect, Pedro stated that the police department told him to contact the State's Attorney's office. Pedro did contact and meet with the Will County State's Attorney. During the meeting, the Will County State's Attorney played both of Pedro's tape-recorded statements and asked if there were any additions, corrections or deletions to be made. Pedro replied at that time, "No." Pedro did not tell them about any problems with the taped statement until at trial.

The People then presented Officer Terrence Mazur. Officer Mazur stated that he took the tape-recorded statements of Pedro Palacios. As Officer Mazur read Pedro his constitutional rights, Pedro signed and initialed each right on the constitutional rights form.

During cross-examination, Officer Mazur stated that he asked Pedro to come back a second time on September 17, 1984, to get Pedro's responses on a tape regarding the gun and the gym bag. Officer Mazur stated that Pedro did tell him at the prior meeting that defendant had thrown the gym bag away while Officer Murrin chased him. Officer Mazur did put Pedro's version in his report but on the second session he wanted Pedro to put his version on a tape. Officer Mazur stated that he did not discuss Pedro's response prior to turning on the tape recorder.

Donald Havekost, a special agent with the Federal Bureau of Investigation, performed a neutron activation analysis (NAA) on the swabbing samples from Officer Murrin's hands sent by Officer Randall Fleck, who gathered the evidence from the site. In light of the NAA findings, Agent Havekost concluded that the deceased's left hand was on or near the muzzle of a firearm when it discharged. The chemical amounts in the swabbings removed from the back of the deceased's hands were con-

sistent with both hands' having been on or near the firearm when it discharged. Agent Havekost also concluded that the deceased's right hand could have been on or near the gun as it was discharged. Agent Havekost could not give an opinion regarding which hand was on the gun.

Officer Randall Fleck, a police officer with the City of Joliet for 10½ years, photographed the area and gathered various items of evidence. After he carefully collected the gym bag, he observed that it contained a bandanna, a Smith and Wesson 9 millimeter semiautomatic gun with a clip in it, a spare clip, a pair of brass knuckles, a bottle of cologne, a pack of Life Savers candy, a comb, and a watch. The bag also contained a partially empty bottle of Listerine and a gray cap from a spray paint can. In the photographs taken at the scene, the body was found 16 feet north of the bag. The fence was directly south of the body.

Officer Michael Sheridan, a police officer for the City of Joliet for 7½ years, was working the 3 to 11 shift on the night of the incident. He was patrolling in the area of the incident when, at 5 p.m., he heard a call on the squad car radio announcing that an officer was in foot pursuit and a later report that shots were heard. He found the deceased's gun 50 feet northwest of his body behind 1029 Antram on Draper. He also found a silver chain about two to three feet from the gun. However, under cross-examination he identified a similar chain as the one he observed that day at the scene, but the chain presented at trial was gold.

The People also presented Louis Silich, a police officer with the Joliet police department for 10 years. Officer Silich was working the 7 a.m. to 3 p.m. shift on September 12, 1984, as an evidence technician, but was called to report to work again at 5:15 p.m. and was instructed to go to the scene of the incident. At 1014 Dra-

per, he found two medals and a gold chain on top of a sloped area between the garage at 1014 Draper and the garden plot. At the bottom of the sloped area and 55 feet north of the deceased, he found a .38 special revolver. Officer Murrin's body was on the east side of the fence and the gun was found on the west side of the fence. Officer Silich later went to the hospital and collected evidence from and the personal belongings of the deceased. Among the evidence collected, Officer Silich recovered a knife from a sheath on the deceased's left leg.

Dr. Larry Blum, a forensic pathologist for the county coroners in 11 Illinois counties, performed the autopsy on Officer Murrin. He observed that Officer Murrin had been shot five times and also had injuries consistent with blunt trauma injuries, mainly abrasions or scrapes as well as bruising on the skin. Officer Murrin had bruises and abrasions to his right upper lip below the nostril, another vertical mark on the right ear as well as a prominent scratch behind the right ear. There was no evidence of healing and the abrasions were fresh.

Dr. Blum also found superficial scrapes or scratches on the left upper arm, on the back of the left arm and on the left forearm and a scrape behind the thumb on the palm surface on the left hand. The deceased also had abrasions on the right upper arm and on the back of the right elbow. On the back of the neck and the front right side of the neck, there were four parallel abrasions. Dr. Blum observed fresh abrasions on the deceased's front right knee and two abrasions on the back of the left knee.

Dr. Blum also observed several gunshot wounds. The deceased had a gunshot wound two inches below the top of his head in the center of his forehead which traveled from right to left. Dr. Blum stated that the gunshot wound to the forehead was fatal and was inflicted at a

distance of 6 to 24 inches, possibly farther. Another gunshot wound was in the right ear passing through the front of the ear and out the back, traveling from the left side to the right side with a downward trajectory. The gunshot wound to the right ear was not a fatal type and the range of fire for the ear wound was 6 to 24 inches. The gunshot wound to the right chest traveled from front to back toward the victim's left side at a 20-degree angle. It was not a fatal type of wound. The other chest wound to the right side was three inches below the uppermost wound traveling at a 60-degree angle downward. This wound was a fatal type inflicted within a six-inch firing range. The fifth wound was located on the left side of the chest traveling from left to right in a slightly downward angle. The firing range for this wound was greater than two feet.

The doctor gave an estimation "based upon common sense and medical knowledge" regarding the exact sequence of the gunshot wounds. He stated that the chest wounds were first because they produced a great deal of internal bleeding. If the head wound, which was fatal instantaneously, was first, it would have prohibited the victim from producing any significant amount of internal bleeding.

The doctor stated that the alcohol level found in Officer Murrin's blood was .043% and in Officer Murrin's urine was .02%. The doctor also stated that while .043% does not necessarily indicate intoxication, that level of alcohol may have different effects on individuals depending on whether or not that person is used to the effects of alcohol. A blood-alcohol level of .02 to .04 can have from no significant effect to a feeling of mild euphoria or a mild sense of well-being. If a person is accustomed to that level of alcohol, then the effects may be negligible.

The People presented Dr. Robert Hunton, a forensic scientist with the Bureau of Forensic Sciences Crime

Lab in Joliet, who specializes in the field of firearms identification. In performing tests to determine the distance at which defendant shot Officer Murrin, Dr. Hunton observed that the two entrance bullet holes on the right side of the shirt above the pocket were from a gun which was shot at a distance of less than an inch. The bullet hole on the left side of the shirt near the pocket was caused by a bullet from a gun which was fired within four to six feet.

Larry Knott, a police officer who had been with the Joliet police department for 17 years, is a court liaison for the police department and the Will County State's Attorney's office. On August 21, 1984, his duty was to obtain a warrant charging defendant with aggravated battery, a felony, in the shooting of Frederick Ferguson.

Michael Broadwell, a friend of defendant, stated that on September 12, 1984, he saw defendant first at defendant's house around 11 a.m. After 20 minutes, Broadwell and defendant left on defendant's bicycle to go to a creek on Abe Street. Broadwell was carrying a 9 millimeter pistol which he obtained from defendant's basement. Defendant and Broadwell stayed at the creek for 1½ hours to two hours. They made plans to leave the State once Broadwell was on parole from the work release center. While at the creek, they "got high" by sniffing spray paint and did some target practice. They then left for Johnny Garcia's house. When defendant and Broadwell arrived at the Garcias' house, only Johnny Garcia's brother Pauly was present. Johnny Garcia arrived later driving a green Buick. They stayed at the Garcias' house until it was time for Broadwell to return to the work release center. When Johnny Garcia gave Broadwell a ride, he was accompanied by Johnny's brother Pauly, defendant and Pepi Salazar, defendant's brother.

Thomas Stein, an officer with the Joliet police department for over four years, related a conversation he had with Officer Murrin on August 27, 1984. At that time they discussed the felony arrest warrant which charged defendant with aggravated battery in the shooting of Frederick Ferguson. Officer Stein told Officer Murrin that defendant might possibly be located on the east side of the City of Joliet and that he might possibly be with Johnny Garcia in Garcia's 1970 four-door green Buick Electra.

On May 21, 1985, Ruben Coronado, a police investigator with the City of Joliet, had picked up defendant in Laredo, Texas. Defendant had been found and arrested on the felony warrant for the instant offense in Mexico. On September 12, 1984, Officer Coronado radioed soon after the shooting of Officer Murrin that defendant might be in the car described at the scene and that the car was possibly owned by Johnny Garcia.

Officer David Gerdes, who had been with the City of Joliet police department for 13 years, was Officer Murrin's immediate supervisor on September 12, 1984. He was aware that Officer Murrin carried a knife on his leg which Officer Murrin had not directly requested permission to wear. According to Officer Gerdes, as well as other supervisors and division commanders, department policy guidelines did not prohibit the carrying of the type of knife worn by Officer Murrin.

Pamela Ann Murrin, wife of the victim, stated that on September 12, 1984, her husband was 32 years old and in excellent health. He was particularly happy on September 12 because he had just scored very high on a sergeant's test and was looking forward to becoming a sergeant. The only injury the victim had was an old scab on his knee. His uniform clothes on that date were in good condition. She knew of no drinking problem her

husband had but knew that he did drink socially, and on occasions he would have a beer at lunch.

Stipulations were entered for other witnesses. Donna Metzer, a forensic serologist for the Illinois Department of State Police, analyzed various blood samples from the deceased and defendant as well as clothes items from both. In examining the deceased's pants, she found a tear on the right front knee area and a second tear on the right rear area of the pants. When she examined defendant's yellow sweatshirt found near the scene, she found several small areas of blood staining. On the left shoulder of the sweatshirt she found a small smear of human blood and on the lower right back, she found small droplets of human blood. Both areas of stains were applied from the outside and did not soak through the garment. The amount of blood was insufficient to determine the source. She also found two smears of human blood on the inside of the shirt on the left side. The quantity of this blood smear was also insufficient to determine the source.

The second stipulation was that of Jacqueline Fracaro, a fingerprint examiner for the State of Illinois, Bureau of Scientific Services at the Joliet Crime Lab. When examining the gun magazine recovered from the gym bag, she found four latent fingerprints which she determined to be those of defendant. She also recovered a latent fingerprint from a gray paint can cap and determined the print to be defendant's.

The third stipulation was that of Blair Shutts, a forensic scientist for the State of Illinois, Bureau of Scientific Services at the Joliet Crime Lab. When Shutts examined the yellow sweatshirt, the plastic wrap and the tennis shoes, he found that all had a silver gray paint on them which was similar in color and chemical reactivity. It was stipulated that Officer Rex Provenzale recovered the plastic wrap from Johnny Garcia's green Buick.

The remaining stipulations regarded who found each of the projectiles and other evidence recovered at the scene.

Eventually, defendant took the stand. He first stated that his birthday is February 20, 1966. After three years of high school he dropped out and went to work. He stated that in early August 1984, he was staying with his grandparents in Houston, Texas. During the three to four weeks he was in Houston, he did not contact his parents, only his brother Tony. Prior to living in Texas, and after returning to Illinois, defendant stayed with his brother Tony Silvas in New Lenox. He returned to Illinois either the 10th or 11th of September. He identified the gold chains and religious medals found at or near the scene as his.

Defendant also stated that on September 12, 1984, he left his brother's house by bike and traveled to his parents' house, where he later met with Broadwell. Defendant had his 9 millimeter gun with him but Broadwell ended up carrying it. Defendant's and Broadwell's versions of the events prior to and up until the time Broadwell was left at the work release center are similar.

Defendant stated that after he, Pauly and Johnny Garcia, and Pepi Salazar, defendant's brother, dropped Broadwell off at the work release center, they went to Theresa Jones' house to pick up Norman Gates. They then drove to Norman's house. While Norman was at his house, Norman picked up his gun. They then left to go to defendant's grandfather's house to do some target practice. Defendant was sitting in the front passenger side, Norman was sitting in the rear driver's side, Johnny Garcia was driving, Pauly Garcia was sitting in the center of the rear seat and Pepi Salazar was sitting on the passenger side in the rear.

As they drove around, defendant began to sniff paint from a bag. He did not, therefore, see the squad car driven by Officer Ponce pass in front of the car in which he was riding at the intersection of Draper and Woodruff. One of his friends in the car stated, "Put the bags down. There is a cop in front of us." When defendant saw the squad car turn around, he told Norman to "jump out of the car" because they both had a gun. Defendant ran into a grass alleyway. He then heard someone yell "Freeze" or "Freeze, police." He looked back and saw the officer (Murrin) with his gun but kept running because he wanted to get rid of his gun. He finally came upon a fenced-in area which was a dead end. Defendant then threw the gym bag with the gun in it into some bushes. When defendant again turned around, he saw the officer who yelled "Freeze." Defendant, who was facing the fence, put his hands up. Through the corner of his eyes he saw the officer put his gun away. After the officer put his gun away, he turned defendant around and hit him in the right eye and continued to hit him. The officer and defendant then ended up on the ground with the officer on top of defendant in a kneeling position. The officer hit defendant approximately seven or eight times. Defendant kept saying, "I give. I give." At that point, when defendant either pushed or punched the officer, the officer reached for his gun. Defendant also reached for the officer's gun. The struggle continued until defendant fell back and the gun went off and kept going off. Defendant did not recall where the officer was shot. The next thing defendant remembered was walking away and then hearing a police officer yell something to the effect of "Freeze, freeze police." Defendant threw the officer's gun away, jumped over the fence and kept running.

On that day defendant was wearing a yellow T-shirt, jeans and tennis shoes. After defendant shot the officer

and vaulted a fence, he ran on a path along a creek until he came to the Palacios' house. During the run, he took off his pants and shirt. While at the Palacios' house, defendant put on some of David Palacios' clothes. Later, Pedro and David Palacios investigated the scene and told defendant that they heard that he would be shot on sight. The Palacios brothers left the house again and went to the house of defendant's parents to contact defendant's brother George. When the Palacios brothers came back, they told defendant that someone would be coming for him. A man named "Bill" came to the Palacios residence and put defendant into the trunk. Later Bill let defendant out of the trunk and they continued traveling until they reached California. When they arrived in Tijuana, Mexico, defendant left for Monterrey, Mexico.

During cross-examination, defendant stated that his gym bag contained brass knuckles, a comb, a watch, a bottle of cologne and a bottle of Listerine. Defendant also stated that for about half a year, from 1983 to 1984, he had received boxing training about every other day for about two to three hours. He also had taken Tae-Kwan Do self-defense lessons which involved the use of the body and mostly the hands.

It is a fundamental principle of due process that the prosecution must prove every element of an offense beyond a reasonable doubt. (*In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073.) The fact finder may infer intent to take a life from defendant's acts and the circumstances surrounding the commission of the offense. (*People v. Garcia* (1983), 97 Ill. 2d 58, 85.) Intent to take a life may specifically be shown not only from the character of the assault and the surrounding circumstances but also from the use of a deadly weapon. (*People v. Koshiol* (1970), 45 Ill. 2d 573, 578.) Whether or not this court views the evi-

dence in a light most favorable to defendant (see *People v. Garcia* (1983), 97 Ill. 2d 58, 85), it is well established that every sane man is presumed to intend all the natural and probable consequences flowing from his own deliberate act. (*People v. Koshiol* (1970), 45 Ill. 2d 573, 578.) Where a man wilfully does an act, the natural and direct tendency of which is to destroy another's life, the trier of fact may reach a "natural and irresistible conclusion," in the absence of qualifying facts, that the act to destroy another's life was intended. (45 Ill. 2d at 578.) In this case, even looking at the evidence most favorably to defendant, this court finds that the uncontroverted evidence presented at trial concerning defendant's conduct and the physical evidence reveals that defendant had the requisite mental state.

Defendant argues that he ran from the officer because defendant had a gun in his possession and not because there was an outstanding felony warrant issued against him. However, his explanation is without support from the evidence. Defendant explains that he was running from a misdemeanor, not a felony warrant. It is, however, unlikely that defendant would run from a misdemeanor charge. Rather, defendant's actions prior to this offense reveal his knowledge of the felony warrant. Soon after the shooting incident of Frederick Ferguson, which resulted in the felony warrant, defendant left the State, and upon returning, made plans to leave the country the next day with his friend, Broadwell.

Defendant also stated that he threw away the gym bag with the gun in it as he saw the officer approach but before he became "fenced in" at the end of the alleyway. At this point defendant stated that he stopped while facing the fence and put his hands up. His explanation that he gave up at this time because he was "fenced in" does not coincide with his ability to vault fences immediately after the offense. Defendant's version also does not

agree with his later account that he surrendered only after the infliction of numerous blows to his face by the deceased. Defendant's testimony to the contrary reveals that he did not surrender at that time because he eventually struggled for and obtained the deceased's gun. This court finds that even in the light most favorable to defendant, the evidence shows that defendant, in his attempt to escape by vaulting the fence, was approached and stopped by Officer Murrin. At this point a struggle ensued and not any semblance of a surrender.

This court concludes that with defendant's training and experience as a boxer, and with his training in Tae-Kwan Do and the evidence adduced at trial, Officer Murrin received the beating and not defendant. Officer Murrin no doubt was able to strike defendant in the face but defendant, in his attempt to escape, administered most of the punches in the struggle. The autopsy revealed that the officer had fresh abrasions and bruises on his body. While the evidence reveals that defendant left basically unscathed, Officer Murrin sustained bruises and abrasions to his right upper lip and a vertical mark on his right ear as well as a scratch behind his right ear. He also had scratches on the back of his left upper arm and on his left forearm, a scrape behind the thumb on the palm surface of the left hand, and abrasions on his right upper arm and on the back of his right elbow. On the back of his neck and on the front right side of his neck four parallel abrasions were found. Officer Murrin also sustained abrasions on his front right knee and two abrasions on the back left knee. Compared to defendant's puffiness in his right eye, it is apparent that defendant was the aggressor.

To corroborate defendant's version of the struggle, he refers to Pedro Palacios' statements, Officer Murrin's blood-alcohol level and use of a sheath knife and defendant's broken neck chains. However, these facts do not

support the proposition that Officer Murrin was the aggressor. Pedro's statement reveals that defendant only attempted to give up during the struggle. Pedro's description of defendant's face immediately following the incident is not comparable to the injuries sustained by Officer Murrin. Moreover, Willie Pitts and Officer Ponce did not notice any injuries to defendant's face as he fled the scene. Defendant's version of the struggle is not supported by the testimony at trial. Further, evidence of the broken neck chains reveals that Murrin may have been restraining defendant from escaping or may have been defending himself in the short-lived struggle. Of significance is the fact that Pitts and Officer Ponce stated that the incident happened in a matter of a few minutes and as such rules out any possibility of a drawn-out struggle as indicated by defendant.

Defendant points out that the officer's blood-alcohol level and his sheath knife attached to his leg show that Officer Murrin was the aggressor. However, the testimony at trial did not conclusively show that the officer was intoxicated. The deceased was known to drink socially and was accustomed to the effects of alcohol and, as such, the effects of alcohol would have been negligible. The evidence reveals that the officer was in an exceptionally good mood because he just received his scores back from the sergeant's exam and found out that he would be promoted. Although the deceased carried a sheath knife without department permission, it was not against the department rules to carry one, and the deceased's immediate supervisor knew about the knife. This court finds that these facts do not reveal an aggressive, law-breaking individual.

Defendant also alleges that the officer kept hitting him even after he yelled, "I give." At that point defendant alleges that he punched or pushed the officer and a struggle ensued. When he saw the officer reach for his

gun, the next thing he remembers was the gun going off. However, defendant's version does not support the view that he was surrendering but, rather, that defendant was exercising a ploy to catch the officer off guard in order to renew his escape with added vigor.

Defendant argues in the alternative that if the People did prove beyond a reasonable doubt his intention to kill the officer, he did so in self-defense. However, as previously stated, the evidence does not support defendant's argument. First, the struggle was one-sided. Second, defendant had a motive to escape from a felony warrant and not from a potential misdemeanor charge, and he had already made travel plans to leave the country after just arriving in town. Third, there is no persuasive evidence that the officer was the aggressor. Although Officer Murrin had a .04 blood-alcohol content, a person such as the officer, who was a social drinker, would not experience the mild euphoria associated with that level of alcohol. It is unlikely that Officer Murrin experienced any elevated state of well-being resulting in a more aggressive stance in his pursuit of defendant. Furthermore, the evidence reveals that the officer had no difficulty pursuing defendant. Thus, defendant's argument is without support.

Defendant argues also that, in the alternative, the evidence reveals that he committed voluntary manslaughter, in that he intentionally or knowingly killed an individual because he believed the circumstances to be such that, if they existed, would justify or exonerate the killing even if his belief is unreasonable. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2.) In this case, defendant did not act with any unreasonable belief that would justify his taking of the deceased's weapon and shooting the victim five times at very close range. The facts reveal that defendant had motive to flee and was the initial aggressor in the struggle as well as the dominant figure in the

short-lived altercation which followed. He also fired the gun at the deceased not once but five times at very close range. When Officer Ponce arrived near the scene, he saw defendant standing with the gun pointed downward at a 45-degree angle. Except for defendant's testimony, nothing in the record reveals that he acted in any other way but deliberately and intentionally to kill Officer Murrin.

Defendant also argues in the alternative that he should be found guilty of involuntary manslaughter in that he unintentionally killed the officer without lawful justification because his acts, whether lawful or unlawful, caused the death to the deceased and he performed those acts recklessly. (Ill. Rev. Stat. 1983, ch. 38, par. 9—3.) As stated previously, the evidence reveals that defendant acted intentionally. His knowledge of how to fire a gun, his statement that he did reach for the gun, his motive to escape and his dominant and aggressive role in the struggle show that the act was intentional.

Thus, this court concludes that the People proved beyond a reasonable doubt that defendant acted with intent to kill Officer Murrin, a peace officer acting within the scope of his duties. "A voluntary and wilful act which has the natural tendency to cause death or great bodily harm is sufficient evidence of the intent required for the offense of murder." *People v. Foster* (1987), 119 Ill. 2d 69, 88.

### III

Defendant next raises the issue that the circuit court erred in admitting evidence of the felony arrest warrant charging defendant with aggravated battery against Frederick Ferguson and the complaint. It is well recognized that "relevant evidence" has been defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence." (*People v. Stewart* (1984), 105 Ill. 2d 22, 54.) It is also established that "[e]vidence of other crimes, while not admissible to show the propensity to commit crime, is admissible to show motive." (105 Ill. 2d at 56.) Furthermore, "while any evidence which tends to show that an accused had a motive for killing the deceased is relevant, such evidence, to be competent, must at least to a slight degree tend to establish the existence of the motive relied on." (105 Ill. 2d at 56.) Only where the relevance of evidence depends on unproved assumptions is it inadmissible. (*People v. Newbury* (1972), 53 Ill. 2d 228, 240; *People v. Jones* (1982), 108 Ill. App. 3d 880, 884.) Specifically, an arrest warrant and complaint are inadmissible where the existence does not establish anything about the defendant's state of mind. See *People v. Wilson* (1987), 116 Ill. 2d 29, 52.

In this case, the evidence of the warrant and complaint is admissible in light of the facts established at the trial. Defendant's motive to kill the officer is reflected in defendant's leaving the State of Illinois after the shooting incident of Frederick Ferguson, which resulted in the arrest warrant and complaint of August 21, 1984. Defendant stated that on the date of the shooting of Officer Murrin, he had just returned from Texas and was planning to leave the area with a friend who was being released from a work release program the next day. When defendant saw the police car beginning to follow the car he was in, he immediately fled. The evidence surrounding his flight and the subsequent struggle reveals defendant's strong desire to escape.

The testimony at trial also reveals that defendant actually threw the gym bag over the fence prior to his attempt to vault it, defendant was the initial aggressor and dominant figure in the struggle, and defendant eventually shot the officer not only once but five times

at close range and immediately fled not only the area but also the country. The extent to which defendant fought to escape does not show someone who was fleeing a misdemeanor offense. Rather, the evidence supports the admissibility and relevancy of the arrest warrant and complaint to show his motive to escape, and to make it less probable that Officer Murrin was the aggressor. Thus, this court finds that the court did not err in allowing the evidence of the arrest warrant charging defendant with aggravated battery, and the complaint, into evidence at the trial.

## IV

Defendant argues that the circuit court erred when it permitted the People to introduce two entire prior taped statements of Pedro Palacios where allegedly only two inconsistencies existed. Defendant specifically argues that Pedro's statements did not contain enough inconsistencies to be admitted into evidence as substantive evidence. Defendant does not argue that Pedro's statements do not meet the other requirements of the statute.

The People argue that not only were Pedro's prior taped statements inconsistent with his testimony at trial but the tapes also contradicted another witness' testimony regarding the circumstances surrounding the making of those tapes. Accordingly, the People argue that the circuit court properly admitted both taped statements in their entirety. On appeal, this court will not substitute its opinion for the circuit court's and will only reverse a circuit court's decision where it has abused its discretion.

Section 115—10.1 of the Code of Criminal Procedure of 1963 provides, in part:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement * * *
  * * *

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and
  * * *

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder * * *." Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1.

Since defendant did not raise the issue whether the taped statements met the statutory requirements, this court will not discuss it. In our reading of the statute, we find that it does not require a certain minimal amount of inconsistencies. We do, however, find several inconsistencies in Pedro's taped statements with trial testimony. In the first statement, Pedro stated that (1) his brother David told him that defendant was in the back; (2) that the officer hit defendant once in his eye and defendant hit him back; and (3) that when the officer started to fall back, defendant grabbed the officer's gun and shot the officer once and then fired the rest of the bullets. In the second statement, Pedro stated that after defendant shot the officer, he threw the gym bag away. In Pedro's trial testimony, he stated that defendant told him that defendant threw the gym bag away before his encounter with Officer Murrin; and that defend-

ant reached for Officer Murrin's gun because defendant could not take the beating by the officer. Pedro also stated that his brother actually told him that defendant was in the backyard "all beat up."

In defendant's argument, he specifically attempts to have this court proclaim a quantitative or mathematical analysis as a prerequisite to the application of section 115—10.1. If the General Assembly had intended such a prerequisite, it could have provided for it in the statute. The General Assembly, however, provided for the circuit court to have discretion in determining whether or not the testimony is inconsistent with a prior statement. A circuit court's discretion is not based on a quantitative analysis but a qualitative one. In some circumstances, this court recognizes that a mere tendency to be inconsistent will be enough to admit the statements into evidence and in other circumstances more than a mere tendency would be needed to admit the statements. It is for the circuit court to determine the issue. Although this court finds that the above-listed inconsistencies are few, these inconsistencies are significant and specifically relate to the credibility of Pedro himself. These inconsistencies also affect the credibility of Officer Mazur and defendant. Pedro's testimony at trial reveals a different set of circumstances surrounding the making of both tapes as well as a different version of the incident. Since the taped statements go to the issue of Pedro's credibility, the circuit court did not err when it admitted the taped statements into evidence.

## V

Defendant argues that the circuit court erred when it permitted the People's witness, a pathologist, to testify regarding the sequence of the gunshot wounds. Defendant alleges that the pathologist's testimony was based upon mere conjecture and speculation and not upon any

well-recognized scientific principle or technique. Defendant does not argue that the pathologist was not qualified to answer the question; defendant argues that the pathologist's testimony was not based upon a reasonable degree of medical certainty but rather that the testimony was based on merely "some estimations" and was therefore impermissibly speculative.

It is well established that the burden of establishing the qualifications of an expert witness is on the proponent of the expert testimony. Once the proponent has established the expert's qualifications, it is then within the discretion of the circuit court to determine whether the proponent has met its burden of qualifying an expert witness. This court will only reverse that decision if it constituted an abuse of discretion. (*People v. Park* (1978), 72 Ill. 2d 203, 209; see *People v. Jordan* (1984), 103 Ill. 2d 192, 208.) The People met their burden of establishing Dr. Larry Blum's qualifications.

On direct, the People examined Dr. Larry Blum, the pathologist, regarding each of the five gunshot wounds. The doctor, based upon his medical knowledge and experience, related the distance and angle at which each wound was inflicted, the direction the bullet traveled in the body and the damage to the body each bullet caused. Dr. Blum also stated that he had done 850 autopsies and appeared in court 35 times. When the People asked his knowledge of the possible sequence of the gunshot wounds, Dr. Blum stated:

"I just don't know of any foolproof way of determining various gunshots.

There are some estimations, based upon common sense and medical knowledge, that can be made, but as to the exact sequence of gunshot wounds, unless you were there and actually saw it, I know of no absolute way of absolutely reconstructing them."

When the People then asked Dr. Blum if he had an opinion regarding the sequence of the gunshot wounds, defendant objected, arguing that the opinion was speculative. At that time, the circuit court ordered the jury out of the courtroom and heard arguments. The circuit court then personally asked Dr. Blum:

"THE COURT: All right. You indicated you have an opinion as to the chest wounds that caused a large amount of bleeding as opposed to the wound of the forehead; is that correct?

THE WITNESS: Yes, your Honor.

THE COURT: Is that opinion, what we are talking about, is that based upon a reasonable degree of scientific certainty?

THE WITNESS: Yes, your Honor.

THE COURT: All right. Bring back the jury.

If the question is asked, I am going to allow him to answer it."

The court then allowed the People to present an offer of proof. At the end of the offer of proof, defendant still objected but the court allowed Dr. Blum to testify regarding the question. Dr. Blum stated that in his opinion, within a reasonable degree of medical certainty, the head wound followed the chest wounds because of the large amount of internal bleeding present in each chest cavity. If the head wound came first, it would have resulted in the victim's death immediately and any subsequent wounds to the chest or elsewhere would not have resulted in this much bleeding.

In this case, the record reveals that the circuit court did not abuse its discretion. First, the expert was not testifying to matters within common knowledge of the lay person and his testimony aided the trier of fact in reaching a conclusion. (*People v. Jordan* (1984), 103 Ill. 2d 192, 208.) Further, his opinion was not speculative but based on matters requiring scientific knowledge. His

particular skill and judgment was essential to explain the cause and effect of each injury. (*People v. Ciucci* (1956), 8 Ill. 2d 619, 626, *aff'd* (1958), 356 U.S. 571, 2 L. Ed. 2d 983, 78 S. Ct. 839.) In this case, Dr. Blum testified regarding the amount of blood loss which had occurred from the various gunshot wounds. His testimony also explained why a certain amount of blood loss would occur if the officer were still alive and how much blood loss would have occurred if the officer had died from the head wound prior to the chest wound. Thus, the testimony given by Dr. Blum required special skill and knowledge and as such, his resulting opinion on the order of gunshot wounds was not based on mere estimations and was not impermissibly speculative. Thus, this court finds that the circuit court did not abuse its discretion.

## VI

Defendant argues that he was denied a fair trial because the deceased officer's widow was allowed to testify about the length of the couple's marriage, the lack of marital problems and the couple's school-age children. This court notes that although defendant objected to this testimony at trial, he failed to reassert the issue in his post-trial motion and as such the issue is properly deemed waived. (*People v. Wright* (1985), 111 Ill. 2d 128, 153.) Moreover, had there been no waiver, this court finds that defendant was not prejudiced.

It is established that the testimony of a life-and-death witness which is given for the purpose of establishing the identification of the decedent is admissible for those purposes. "Furthermore, it is not always error to admit evidence showing that a murder victim has left a spouse or children when such evidence is elicited in an incidental manner not causing the jury to believe such evidence is material." *People v. Thompkins* (1988), 121 Ill. 2d 401, 446.

In this case, Mrs. Murrin testified to the length of their marriage, the absence of marital problems, the deceased's physical condition, the deceased's state of mind, the presence of only one old wound on his knee, the condition of his clothes as he left for work, the deceased's drinking and eating habits, and the deceased's mental state prior to leaving for work. Her testimony only related facts regarding the physical and mental state of the deceased on the day of the incident. Furthermore, her testimony was relevant to defendant's claim of self-defense. Her one and only reference to the existence of children was:

"STATE'S ATTORNEY EDWARD PETKA: And were you regularly with him or were you in and out of the home?

MRS. MURRIN: Oh, I was in and out of the house all day, because I was trying to get the yard work done before the kids came home from school."

Although the reference to the couple's children was unnecessary, it was inadvertent, incidental and innocuous, especially in light of the entire testimony. Thus, this court finds that defendant was not denied a fair trial because of the admission of Pamela Murrin's testimony.

## VII

Defendant argues that the circuit court committed reversible error when it instructed the jury on People's instructions Nos. 18A, 19B and 20A because the evidence failed to warrant their use. Defendant specifically argues regarding instruction No. 18A that it was not only a non-Illinois Pattern Jury Instruction (IPI), but that it was also an incorrect statement of the law.

People's instruction No. 18A provides:

"A person is not justified in the use of force if he is escaping after he has been charged with the commission of a forcible felony." See Ill. Rev. Stat. 1983, ch. 38, par.

7—4(a); Illinois Pattern Jury Instructions, Criminal, No. 24—25.10 (2d ed. 1981) (hereinafter IPI Criminal 2d).

People's instruction No. 19B provides:

"A peace officer need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest or to defend himself from bodily harm while making the arrest.

However, he is justified in using force likely to cause death or great bodily harm only when he reasonably believes both that such force is necessary to prevent the arrest from being defeated by resistance or escape and the person to be arrested has committed or attempted a forcible felony; or is necessary to prevent the arrest from being defeated by resistance or escape and the person to be arrested is attempting to escape by use of deadly weapon or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay." See IPI Criminal 2d No. 24—25.12; Ill. Rev. Stat. 1983, ch. 38, par. 7—5(a).

People's instruction No. 20A provides:

"A peace officer who has an arrested person in his custody is justified in the use of any force which he reasonably believes to be necessary to prevent the escape of the arrested person or to defend himself from bodily harm while preventing the escape.

However, he is justified in using force likely to cause death or great bodily harm only when he reasonably believes both that such force is necessary to prevent the escape and the person attempting to escape has committed or attempted a forcible felony; or is necessary to prevent the escape and the person is attempting to escape by use of deadly weapon or otherwise indicates that he will endanger human life or inflict bodily harm unless prevented from escaping without delay." See IPI Criminal 2d No. 24—25.13; Ill. Rev. Stat. 1983, ch. 38, par. 7—5(a).

Although defendant includes instruction Nos. 19B and 20A in his argument, he failed to offer any support for

his argument and, accordingly, has waived any argument. However, this court will address those instructions in connection with instruction No. 18A.

Regarding People's instruction No. 18A, defendant argues that the court should have instructed the jury on IPI Criminal 2d No. 24—25.10 and not the submitted version. It is well established that the circuit court need not use an IPI instruction when it determines that it does not accurately state the law. (107 Ill. 2d R. 451(a).) Further, it has been established that a jury instruction is "to convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it in order that, having determined the final state of facts from the evidence, the jury may, by the application of proper legal principles, arrive at a correct conclusion according to the law and the evidence." *People v. Gambony* (1948), 402 Ill. 74, 81-82; *People v. Mitchell* (1975), 27 Ill. App. 3d 117, 121.

In order to determine whether the amended IPI instruction was proper, the court must look at the IPI instruction in light of the facts and any relevant applicable law. In this case, defendant immediately left the area after the commission of aggravated battery against Frederick Ferguson, a forcible felony for which there was an eventual arrest warrant. Defendant did not come back into the area until just prior to the instant offense. Furthermore, his only reason to return to the area was to have a friend accompany him in leaving not only the State, but the country. There appears to have been no longing by defendant to be home with his family because, as defendant stated at trial, he had had no contact with his family during the weeks he was in Texas. His only contact with his family was when he called his brother, Tony, prior to leaving Texas. In light of these facts, it appears that defendant was not only still escap-

ing but was also "on the run" from the commission of a forcible felony.

Our conclusion that defendant was still escaping must also be read in light of the escape statute, the amended IPI instruction and the facts of this case. (Ill. Rev. Stat. 1983, ch. 38, par. 31—6.) One element of escape is that defendant has been charged and escape is an especially serious offense if committed by a felon. (*People v. Simmons* (1981), 88 Ill. 2d 270, 275.) In this case defendant, a felon, used force in an attempt to escape from a forcible felony with which he had been charged. Since IPI number 24—25.10 and section 7—4 describe those persons who cannot use force, the modified IPI instruction submitted to the jury not only accurately described the facts presented to the jury but also submitted a description of the applicable law.

However, defendant argues that section 7—4(a) refers to escape immediately following the commission of a forcible felony. He specifically argues that "the legislative intent was not to remove a person's right to self-defense for an indefinite time period after the commission of a forcible felony." This court finds defendant's interpretation too restrictive. The court further finds that defendant's argument relies on an assumption that even without the word "immediately" in the statute or the IPI instruction, the General Assembly intended the statute to mean "immediately" after the commission of a forcible felony. Defendant does not cite any authority for this assumption.

In reading the statute and the accompanying committee notes, it is apparent that the assumption that a person must be in the process of committing a forcible felony or that a person must have just completed the commission of the forcible felony is a misunderstanding of the intent of the statute. This court finds that the General Assembly did not intend to limit section 7—4 as

suggested by defendant. The General Assembly intended the statute to cover situations prior to the commission of a forcible felony, at the time of the commission of a forcible felony, and after the commission of a forcible felony, without reference to a specific time period. In reading the statute it is clear that the General Assembly did not fix a definitive time period so as to allow the statute to be applicable to all the circumstances which may surround the commission of a forcible felony. We have no doubt that the General Assembly intended to cover situations such as the one before this court. The record reveals that defendant had knowledge of the charge of a forcible felony against him and that he absconded himself from the area only to return in time to meet with a friend who was just being released from a work release center in order to plan leaving the country the following day. Thus, this court finds that the evidence warranted the use of the amended instruction. Accordingly, the circuit court did not commit reversible error.

Defendant also argues that the evidence did not warrant the use of instructions 19B and 20A. These instructions, however, must be read in light of instruction number 18A and the facts of this case. A police officer is justified in using force likely to cause death or great bodily harm when he reasonably believes both that such force is necessary to prevent the escape of a person and that the person is using escape to defeat the arrest. We agree with the People's reasoning that without these instructions the jury would not have been able to find that the alleged use of force by the deceased officer was justified under section 7—5 absent the officer's reasonable belief that defendant had voluntarily placed himself in the position of an immediate aggressor. We also find that without these instructions the jury would find section 7—4(a) inapplicable without defendant's voluntary place-

ment of himself in the position of an immediate aggressor.

Furthermore, since an officer is entitled to utilize even deadly force when he reasonably believes it necessary to effectuate an arrest for a forcible felony, our analysis of the legislative intent regarding instruction 18A was proper. Section 7—4 only contemplates a situation in which the person who has provoked the use of force but not deadly force against himself and who then becomes unexpectedly threatened with deadly force. (Ill. Ann. Stat., ch. 38, par. 7—4, Committee Comments, at 408-09 (Smith-Hurd 1972).) However, as in this case, a person who is escaping after the commission of a forcible felony cannot argue that the use of force by a police officer to prevent escape from a forcible felony was unexpected. (Ill. Rev. Stat. 1983, ch. 38, par. 7—5.) Thus, defendant in this case who was also a forcible felon at the time of the instant offense cannot claim a qualified right to meet excessive force with deadly force and it is defendant who must suffer the legal consequences of his choice to kill. (Ill. Ann. Stat., ch. 38, par. 7—4, Committee Comments, at 408-10 (Smith-Hurd 1972).) In light of these findings, this court finds that all three of the instructions were proper; accordingly, the circuit court did not commit reversible error.

## VIII

Defendant argues next that the circuit court abused its discretion when it admitted into evidence irrelevant and unreliable hearsay at the death penalty hearing. This court finds that defendant misunderstands the function of the death penalty hearing.

At the death penalty hearing the nature of the crime and the character of the accused are considered. (*People v. Stewart* (1984), 104 Ill. 2d 463, 492.) In order to allow all relevant evidence in at the aggravation and mitiga-

tion hearing, the restrictive rules of evidence do not govern. (*People v. Perez* (1985), 108 Ill. 2d 70, 86.) Rather, at the hearing the evidence is admissible on the grounds of relevancy and reliability. These prerequisites must be met to the satisfaction of the trial judge's sound discretion. (108 Ill. 2d at 88.) Evidence is relevant if it has "any tendency to make the existence of any [material] fact *** more probable or less probable than it would be without the evidence." *People v. Free* (1983), 94 Ill. 2d 378, 413.

Defendant argues that the testimony regarding his gang affiliation was "completely and totally irrelevant to the shooting in the instant case." We find otherwise. It is established that proof of prior misconduct is deemed relevant to a defendant's character although it may not have resulted in prosecution (*People v. Brisbon* (1985), 106 Ill. 2d 342, 365) and proof of defendant's "propensity" to conduct himself in a particular manner is sufficiently relevant to be admissible at the death qualification hearing (*People v. Free*, 94 Ill. 2d at 424). Furthermore, any evidence regarding defendant's character is relevant. *People v. Stewart*, 104 Ill. 2d at 492.

Some of defendant's objections are to hearsay evidence regarding his gang affiliation. However, this court finds that without evidence regarding his character, the jury would not have had all of the necessary information to decide the death qualification issue. Moreover, the People's evidence concerning defendant's gang affiliation was corroborated, thereby making the evidence not only relevant but also reliable. In defendant's argument, he specifically refers to the testimony of Officer Coronado, to the testimony of Police Officer Robert Simandel, and to the testimony of FBI Special Agent Wayne Zydron.

Officer Coronado stated that on August 14, 1984, he spoke with defendant's parents and specifically told defendant's mother that defendant was a member of the

Latin Kings gang. He was looking for defendant regarding a shooting incident for which defendant was later charged. Officer Simandel, who has been an officer with the Chicago police department's gang crimes section for 13 years, was shown the photographs taken of defendant as he arrived at the jailhouse after his arrest for the instant offense. He stated that the photographs showed defendant "putting down the Disciples" street gang with a hand gesture. Agent Zydron stated that he interviewed Lewis Zamudio, who told him that he (Zamudio) was a former general in the Latin Kings gang and defendant was a lieutenant in the Latin Kings.

Each of the witnesses gave testimony which revealed information about not only defendant's character but also defendant's social environment. Moreover, each of the statements are intertwined and add to the reliability of the statements.

Officer Coronado's testimony was corroborated by Zamudio's October 27, 1984, statement that defendant was a lieutenant in the Latin Kings street gang and by Simandel's testimony that a photograph taken of defendant after his arrest depicted him as seriously degrading the Disciples, a rival gang, through a hand gesture. Furthermore, Officer Coronado gathered his information during an official investigation of the aggravated battery incident against Ferguson prior to the instant offense and defendant never directly challenged Officer Coronado's testimony. See, *e.g.*, *People v. Morgan* (1986), 112 Ill. 2d 111, 143-44.

Defendant presented two witnesses, Maurice Sherrod and Gabriel Ben Moreno, to challenge the testimony regarding gang affiliation. Sherrod testified that he had known defendant since junior high school and did not know defendant to be a gang member or carry a gun. However, Sherrod had only seen defendant once between the summer of 1983 and the time of the offense at issue.

Moreno, a boxing coach for the Joliet park district, stated that he did not know defendant to associate with any gang. Moreno, however, had not worked with defendant since approximately 1983 and had heard others state that defendant was a gang member.

Defendant also argues that Frederick Ferguson's statements to Officer Saxon regarding the person who shot him in the legs were not relevant or reliable. However, as the People point out, defendant opened the door on the matter by suggesting during cross-examination of Officer Saxon that no probable cause existed for the arrest at the time the police sought to question defendant on the shooting. Furthermore, Ferguson's statements were sufficiently corroborated to render them reliable.

Ferguson did not initially cooperate with the police because he wanted to handle the matter himself. Later, when he did decide to cooperate, he stated that a driver of an orange vehicle, which had pulled up alongside him as he stood in front of 322 South Ottawa Street, had shot him in the leg with a sawed-off shotgun. The driver was accompanied by three black males. He described his assailant as a 16- to 17-year-old Mexican male who attended Joliet High School and whose nickname was Junior. Ferguson also stated that the assailant yelled "L.K." as he fired the gun. Ferguson also positively identified defendant as the assailant.

James Booker and Beatrice Mays, witnesses to the shooting incident, corroborated the fact and location of the shooting. Identification of defendant as the assailant was corroborated by his nickname of Junior, his attendance at Joliet High School, his physical appearance and his eventual flight after the shooting, which in this case reflects consciousness of guilt.

Defendant argues that the above-mentioned facts were not reliable because of other conflicting testimony. For instance, Ferguson made inconsistent statements re-

garding the incident and failed to sign the warrant. This court finds that the testimony was not so conflicting as to render it unreliable. Ferguson's father stated that another person was responsible for the shooting but he did not state that the other person committed the shooting. Two of the men who Ferguson believed had threatened him in a phone call at the hospital were black, which relates to the description that three black men accompanied defendant in the car on the day of the shooting. Although Booker and Mays did state that Ferguson was shot by a Mexican riding on a motorcycle, Ferguson maintained he was shot by a Mexican male accompanied by three black males. Even in light of these inconsistencies, the evidence was sufficiently consistent to render it reliable and, accordingly, the jury was able to weigh the aggravation value of the August 11 shooting.

Last of all, defendant argues that the testimony of police officer James Stewart regarding a taped statement given by arrestee Elliott Pennick was not relevant. Pennick was booked by Officers Ponce and Murrin just prior to the instant offense. However, this court finds that the fact that within an hour before Officer Murrin's death, he and Officer Ponce spoke at length with arrestee Pennick; that Officer Murrin had treated Pennick "excellent in all respects"; and that Officer Murrin looked healthy and happy when he and Officer Ponce left the police station are all relevant. The arrest of Pennick has a tendency to make it less probable that Officer Murrin acted aggressively toward defendant.

Thus, this court finds that the circuit court did not abuse its discretion in admitting the hearsay testimony of various witnesses.

## IX

Defendant argues that his conviction must be reversed and his death sentence vacated because it was ex-

cessive and disproportionate in light of defendant's character and of the circumstances of the particular offense. The People argue that when each of defendant's arguments are scrutinized, the jury could have rationally found these factors to be insufficient to preclude imposition of the death sentence.

Defendant argues that because of his age, he should not be executed unless there exist overwhelming reasons to do so. He specifically refers to his lack of any significant history of prior criminal activity. While we agree that defendant is young, his prior encounters with law enforcement and his lifestyle belie his assertion of being a person of tender age.

On other occasions, defendant has used age as a method of avoiding the consequences of his criminal activity. When arrested in 1983, defendant told the police that he was 16 years old and subject only to limited criminal prosecution. Defendant was 17 at the time. Also, defendant's prior contact with law enforcement reveals a far more experienced individual than his age would indicate. For example, in 1983 defendant was arrested for the possession of a concealed .357 Magnum revolver and a buck knife. In 1984, a vehicle in which defendant and others were riding contained three .22-caliber handguns. Defendant had on his person at that time a buck knife and 20 rounds of .22-caliber long rifle ammunition. The People also introduced evidence that defendant was a member of the Latin Kings, a street gang, and that in August 1984 defendant shot a rival gang member. On the date of the instant offense, defendant had been with his best friend who was on a prison work release program. Prior to encountering Officer Murrin, defendant shot one of his guns in the air and picked up another gun at his friend Gates' house. Also on the date of this offense, defendant had, in addition to a gun, a pair of brass knuckles in his possession.

Defendant presented evidence at the hearing and also states on appeal that he was a respectful, friendly young man while in custody. Defendant argues that this evidence reveals a person who could be rehabilitated. However, the evidence of defendant's respect for the educational system, law enforcement and society in general do not support this argument. After defendant dropped out of high school, he was caught for a second time in possession of firearms less than two months after the first incident of illegal possession of firearms. After the gang shooting of Ferguson, defendant left the State despite his mother's requests that he turn himself in to the police. Defendant was even planning to leave again on the date of the instant offense.

Defendant relies on *People v. Carlson* (1980), 79 Ill. 2d 564. This court finds that defendant has misapplied *Carlson*. In *Carlson*, this court found that the imposition of the death penalty for the murder of a police officer was inappropriate because the circuit court should have considered as a mitigating factor that defendant's killing of the police officers was "part of one unfortunate and tragic event precipitated by the events leading up to killing" of the defendant's wife; the circuit court should not have allowed the arson and murder of the defendant's wife to preclude it from considering the mitigating effect of a prior life free of crime. This court also held that the circuit court erred in discounting the testimony of the psychiatrist, and in determining that defendant was not under extreme mental or emotional disturbances. This court, in *Carlson*, also noted that the defendant suffered a gradually debilitating physical ailment for two years prior to the offense. Thus, this court concluded that "these mitigating circumstances do not bespeak a man with a malignant heart who must be permanently eliminated from society."

In this case, defendant did not present evidence of any physical infirmity or mental disturbance which would mitigate the circumstance of the offense. Rather, the evidence revealed that defendant's prior history and his character were far from exhibiting a person with strong rehabilitative potential. Defendant did not act under extreme mental or emotional stress but under the sole motivation to escape capture and eventual arrest for a previous forcible felony. Although his previous contact with police does not reveal any resistance, he had every reason to resist in this case because of the outstanding felony warrant. Moreover, the offense in the case was not part of an unfortunate and tragic series of events precipitated by years of debilitating circumstances; rather, the years reveal an individual whose character and lifestyle had been deteriorating. The evidence also reveals that in his attempt to escape, defendant repeatedly shot Officer Murrin, who had been acting in the line of duty, and was the aggressor during the entire incident. These facts do "bespeak a man with a malignant heart." Thus, this court finds that the sentence of death was not excessive or disproportionate.

## X

Defendant argues that this court should reconsider its position on the issue whether, when prospective jurors are excluded which might result in selection of a conviction-prone jury, defendant's right to a fair cross-section of the community is violated. This court has recently reconsidered its position concerning this issue in *People v. Thompkins* (1988), 121 Ill. 2d 401, and stated, citing *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758:

" 'In sum, "*Witherspoon*-excludables," or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to

serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement.' *Lockhart v. McCree* (1986), 476 U.S. 162, 176-77, 90 L. Ed. 2d 137, 150, 106 S. Ct. 1758, 1766." (*Thompkins*, 121 Ill. 2d at 450.)

Accordingly, this court finds that defendant's argument is without merit.

## XI

Defendant argues that the death penalty statute contains inadequate safeguards to prevent arbitrary imposition of the death penalty. This court finds that defendant's argument has been addressed and, as such, declines to alter its previous holdings. *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531.

## XII

Defendant also argues that the death penalty statute violates the eighth and fourteenth amendments of the United States Constitution (U.S. Const., amends. VIII, XIV) because the statute limits the imposition of the death penalty to defendants who do not require special provisions or assistance, such as sign language translation, to be fit for trial. Since this court has addressed and rejected the argument, we find no merit in defendant's argument. *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502.

## XIII

Defendant also argues that the death penalty statute violates the eighth and fourteenth amendments in that it bars the jury at the death penalty hearing from considering sympathy for the defendant. Again, this court notes that this issue has been addressed in *People v. Stewart*

(1984), 104 Ill. 2d 463, 493-94, and as such, finds no merit in this argument.

For the foregoing reasons, defendant's conviction and sentence of death are affirmed. The clerk of this court is directed to enter an order fixing Tuesday, March 14, 1989, as the date on which the sentence of death entered in the circuit court of McLean County is to be implemented. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Affirmed.*

JUSTICE CLARK, dissenting:

While I agree that the evidence below adequately supported the jury's verdict, I cannot agree with the majority's affirmance of the defendant's sentence and conviction. The trial of a close case, pivoting on the credibility of the accused, was marred by several serious evidentiary errors and an erroneous instruction to the jury. These errors, taken in combination, contributed to the defendant's conviction and cannot be considered harmless. I therefore respectfully dissent.

As a careful reading of the majority opinion makes clear, the evidence of the defendant's guilt was not overwhelming. The defendant's testimonial version of events—that he surrendered to the officer, that the officer beat him, and that he shot the officer during the course of an attempt to defend himself—was not entirely inconsistent with the evidence adduced at trial. It was corroborated by the fact that he had thrown away the gym bag with the gun in it before he was arrested and

by some of the testimony given by Pedro Palacios (*e.g.*, by the testimony that the defendant appeared at Palacios' house with his face bloody and swollen). A serious weakness in the State's case was the lack of evidence that the defendant had in fact committed the crime for which the officer was allegedly attempting to arrest him, and which is supposed to have motivated the defendant's flight and resistance to arrest. This evidence would have borne upon motive and upon the defense of justification. As can be seen from the sentencing hearing, the lack of evidence on this point was no accident—it stemmed from the prior victim's initial refusal to cooperate with the police and several inconsistencies in his story. It is unfortunate that the State attempted to remedy this weakness by reading the arrest warrant to the jury and introducing an instruction which told the jury, incorrectly, that the defense of justification is not available to a defendant who escapes after being "charged with" a crime. Since the jury might have inferred a violent character from the contents of the arrest warrant or thought that the fact of the arrest warrant meant that the defendant could not raise the defense of justification, these errors were not harmless beyond a reasonable doubt.

## ADMISSION OF EVIDENCE OF THE FELONY ARREST WARRANT

The general rule in Illinois is that the fact that warrants have been issued for the defendant for previous crimes is admissible where relevant to show the defendant's motive for committing the crime charged but only if "the defendant knew about the warrant or knew that the officers were attempting to arrest him." (*People v. Wilson* (1987), 116 Ill. 2d 29, 52.) Even if the fact that the warrants were issued is admitted for this purpose, "proof of the details of such crimes is improper." *People v. Durkin* (1928), 330 Ill. 394, 404.

There is no showing in the record that the defendant knew about this warrant or knew that the officers were attempting to arrest him for the prior crime charged. The defendant himself testified that he fled from the police car because he had possession of an illegal gun. Without a showing that the defendant was aware of the warrant, the warrant itself does not prove anything about the defendant's state of mind. Moreover, the warrant itself was only an accusation; it was not relevant to prove that the defendant had committed the prior crime. The State did not attempt to prove, other than by the admission of the warrant, that the defendant actually had committed the prior crime, and that the prior crime, rather than the warrant, was his motive for fleeing the officers and killing one of them. Thus cases which the majority cites, such as *People v. Stewart* (1984), 105 Ill. 2d 22, are not pertinent—these cases all deal with proof of prior crimes, not proof that the defendant was aware that he was being sought in connection with these crimes.

Even assuming the warrant was admissible, it was also error to read the entire warrant to the jury, including the statement in the warrant that the defendant committed aggravated battery, a felony, "by shooting *** Frederick Ferguson in the leg while using a deadly weapon, to-wit, a shotgun." These were details of the crime that were highly prejudicial to the defendant since they tended to suggest a propensity to engage in violence. The majority opinion argues that these details were relevant because they showed the depth of the defendant's motive to escape and rebutted his contention that he was not the initial aggressor. Again, however, the majority opinion confuses the relevance of an accusation of a prior crime with relevance of a prior crime. Had the State introduced competent evidence to prove that the defendant had shot Frederick Ferguson, such

evidence would have tended to prove that the defendant, having committed the crime, had a strong motive to resist arrest. However, in the absence of such evidence, the details included in the warrant itself could not provide evidence of motive without a showing that the defendant was aware of what the warrant contained.

## USE OF A NON-IPI INSTRUCTION

While the defendant cites as error the use of three instructions, all relating to the defense of justification, I believe that the only instruction which is truly important is People's instruction No. 18A, which stated: "A person is not justified in the use of force if he is escaping after he *has been charged with* the commission of a forcible felony." (Emphasis added.) This instruction varied from the Illinois Pattern Jury Instruction (IPI) which states that "[a] person is not justified in the use of force if he is ((attempting to commit) (committing) (escaping after the commission of)) a forcible felony." (Illinois Pattern Jury Instructions, Criminal, No. 24—25.10 (2d ed. 1981).) The IPI instruction tracks the language of the statute which provides that the defense of justification is not available to a person who "[i]s attempting to commit, committing, or escaping after the commission of, a forcible felony." (Ill. Rev. Stat. 1985, ch. 38, par. 7—4.) Under Supreme Court Rule 451, non-IPI instructions are not to be used unless they accurately state the law. (See *People v. Haywood* (1980), 82 Ill. 2d 540 (reversing where correct IPI instruction and incorrect non-IPI instruction were both given).) The difference between the two instructions is significant in this case, precisely because the State did not introduce any evidence that the defendant had committed a prior forcible felony, only that he had been *charged with* the commission of a prior forcible felony. Thus it is arguable that IPI Criminal 2d No. 24—25.10 should not have been given at all, let

alone in the incorrect variant actually introduced. The error reinforced the erroneous admission of the arrest warrant.

I am unable to understand the majority's reasoning on this point. At one point the majority appears to be arguing that there was evidence of a prior forcible felony. ("In this case, defendant immediately left the area after the commission of aggravated battery against Frederick Ferguson, a forcible felony for which there was an eventual arrest warrant." (126 Ill. 2d at 464.)) But, aside from the arrest warrant, a mere accusation, no evidence of a prior forcible felony was actually introduced at trial. At another point, the majority appears to argue that section 7—4 only requires proof that the defendant has been charged with a felony because being charged with commission of a crime is an element of escape. (126 Ill. 2d at 465.) This is wrong on two counts. First, section 7—4 requires *both* escape and actual commission of a crime, these requirements being stated in the conjunctive. Second, commission of a crime or a charge that the defendant committed a crime is only an element of felony escape, which is escape "from any penal institution or from the custody of an employee of that institution" (Ill. Rev. Stat. 1983, ch. 38, par. 31—6(a)). If the defendant committed escape at all, it was misdemeanor escape, which is defined as an intentional escape from the "lawful custody of a peace officer" (Ill. Rev. Stat. 1983, ch. 38, par. 31—6(c)).

Because I disagree that this instruction should have been given at all, let alone in an incorrect form, I would not reach the defendant's argument that IPI Criminal 2d No. 24—25.10 should not have been given anyway because it applies only where escape occurs immediately after the commission of a forcible felony.

## ADMISSION OF EVIDENCE OF TWO ENTIRE
## PRIOR TAPED STATEMENTS OF
## PEDRO PALACIOS

On this issue I believe the majority opinion misses the point. Under section 115–10.1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1985, ch. 38, par. 115–10.1), evidence of a prior inconsistent tape-recorded statement may be admitted as substantive evidence under certain conditions. The defendant concedes that certain parts of the prior tape-recorded statements of Pedro Palacios were inconsistent with his trial testimony (*e.g.*, whether the defendant had told him that he threw the gym bag away after his encounter with the officer (prior statement) or before (trial testimony)) but argues that only those inconsistent portions, and not the entire tapes, should be played to the jury. At the trial below, the State argued, and the trial court agreed, that all of the tapes could be played because, in their entirety, they tended to rebut Palacios' explanation that the inconsistencies were due to nervousness, confusion, and suggestive questioning by the interrogating officer. The trial court placed particular emphasis on the value to the jury of hearing Palacios' tone of voice.

The majority opinion does not accurately state the issue, saying that the defendant "specifically argues that Pedro's statements did not contain enough inconsistencies to be admitted into evidence as substantive evidence." (126 Ill. 2d at 456.) The opinion goes on to reject the view that the statute requires some minimal number of inconsistencies in a taped statement before it can be admitted. But this is not what the defendant is arguing; it is his argument that only the inconsistent statements should be played and the consistent portions redacted. The State argues, by analogy with the rule that a witness may be given the opportunity to show the circumstances under which an inconsistent statement was made, that it should be able to

use the tape to rebut the witness' explanation of the circumstances surrounding the inconsistencies.

This is a novel question, and one which, so far as I can discover, is one of first impression. The State appears to be arguing for the admission of the inconsistent portions as substantive evidence per the statute, and the consistent portions as reflecting on the witness' credibility. One problem with this argument is that the jury was not instructed to divide the statements in this fashion; it could have considered the consistent portions also as substantive evidence. Another problem is that the statute itself does not provide for the admission of taped statements to impeach credibility, rebut an attack on credibility, or, as in this case, refute an attempt by the witness to rehabilitate his credibility. I believe that in the absence of precedent, these portions should not have been admitted. Since they may have affected the jury's consideration of Palacios' explanation of the inconsistencies, and since Palacios' testimony was in general not favorable to the defendant, this error was prejudicial.

## EVIDENCE OF VICTIM IMPACT

The general rule is that testimony that the deceased left behind a spouse or children is not admissible at trial because it has no bearing on the guilt or innocence of the accused. (*People v. Bernette* (1964), 30 Ill. 2d 359.) On the other hand, incidental references to the victim's family are permissible where relevant for some other purpose. I would agree with the majority that most of the testimony by the victim's wife was relevant as bearing on the victim's state of mind on the day in question; particularly in light of the defendant's claim that the victim was the aggressor and had been drinking. Evidence that the couple was not suffering from marital problems and that the officer was in good health was relevant to rebut the inference that he was drunk and aggressive. On the other hand, tes-

timony that they had been married 12 years and had an unspecified number of children was probably not relevant for this purpose.

I would agree these references, standing alone, would not mandate reversal. The reference to the length of the marriage was not objected to. And while the reference to children was objected to, it was certainly "inadvertant, incidental, and innocuous"—volunteered by the witness, and unprompted by any specific question. However, in combination with the other errors enumerated above, the admission of the length of the couple's marriage deprived the defendant of a fair trial.

I therefore believe that the defendant's conviction and sentence should be reversed, and the cause remanded for a new trial. While I would therefore not reach the issue of whether the defendant's death sentence was excessive, I agree with the majority that this case is distinguishable from *People v. Carlson* (1980), 79 Ill. 2d 564, because this defendant, unlike the defendant in *Carlson*, did not act under the influence of extreme emotional or mental disturbance and had some, although not an extensive, prior criminal history. On the other hand, the majority's assertions that the defendant's youth should be discounted because of his "lifestyle" and his prior use of his age as a "method of avoiding the consequences of his criminal activity" are unnecessary.

The majority's opinion illustrates the adage that hard cases make bad law. While any killing is terrible, the death of a police officer in the line of duty naturally evokes strong feelings among all members of the law enforcement community—judges included. Under these circumstances, any tendency to bend the rules of evidence in favor of a conviction, however natural, can and must be resisted. I therefore respectfully dissent.

JUSTICE STAMOS joins in this dissent.