THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN BUSH, Defendant-Appellant.

Second District   No. 2—90—0489

Opinion filed April 9, 1992.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, Theodore A. Gottfried, of State Appellate Defender's Office, of Springfield, and Bruce H. Bornstein, of Chicago, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant, John Bush, appeals from a jury verdict finding him guilty of home invasion and aggravated battery. The trial court sentenced defendant to a six-year term of incarceration. On appeal, defendant argues that the trial court committed three errors, namely: (1) abusing its discretion and committing prejudicial error in submitting a non-Illinois Pattern Jury Instruction (IPI) to the jury; (2) allowing the unrelated statement of a codefendant to go to the jury; and (3) allowing prejudicial evidence to be heard by a jury.

The following testimony was adduced at trial. On August 30, 1989, Joyce Fay lived in her Carpentersville residence with her 14-year-old son, Michael Cuniff, and her two daughters, Rebecca and Christy, 16 years old and 1½ years old, respectively. Also present in the house that night were John McPhee, Rebecca's 21-year-old boyfriend, and Chris and Holly Huber, friends of one of her daughters, both 19 years old. Chris and Holly had lived at the Fay residence for about two months. Joyce was awakened by noises, and upon going downstairs, she saw five or six men beating up McPhee. She observed one of the men holding a piece of wood. McPhee was being struck about the body and on the head. The man who was hitting McPhee on the head pushed Joyce back. She fell against the wall and scraped her elbow but required no medical treatment. Her daughter, Rebecca, had a welt on her arm and a swollen jaw, and McPhee was bleeding from the head and had sustained bruises. Joyce had not given the men permission to be in her home or to stay there. After the group left, she observed the front door had little dents in it, and the area by the lock was apparently tampered with. Joyce did not identify defendant as being one of the individuals striking McPhee.

Mike Cuniff was sleeping next to the front door on August 30. In the very early morning, he heard a knock at the door and saw four or five people running into the house. Defendant had a crowbar, while another of the men had a stick and another had an aluminum object. Mike did not give any of the individuals permission to be in the house, nor did he hear anybody else give them permission. He told them to leave; they refused to leave until they got back their money from Mike Ferraro, who was also in the house. Mike Cuniff did not yell for his mother or anybody else in the home. During the fight, defendant had Ferraro around the neck, and McPhee came out of the bedroom. Defendant tried to hit Ferraro, and McPhee then grabbed defendant. Then everyone started punching McPhee. Mike Cuniff did not see the defendant hit McPhee, who was struck by the person carrying the

stick. McPhee was bleeding from the head and had bruises on his body.

Carpentersville police officer Salvator Macaluso testified that the front door of the residence had been damaged. The inside door jamb and striker plate had been forced. John McPhee was bleeding from a head laceration, and a girl had a welt on her arm. The police report prepared by Officer Macaluso regarding the incident did not indicate the point of entry or type of lock. His report also did not indicate the front door had been damaged.

Rebecca Cuniff came out of her bedroom and saw a group of men around Ferraro. She told them to get out because she was afraid her mother was going to get up. Ferraro was pinned up against the wall, but there was no fighting prior to McPhee coming out of the bedroom. The men were talking to Ferraro. It was only after McPhee had come out of the bedroom that the fighting started. Rebecca could not identify the man with the tire iron, nor could she identify the man carrying a piece of wood. She did not see McPhee hit with the tire iron or piece of wood because she was trying to pull people off McPhee. Eventually, all the men then left the residence except one who was still fighting with McPhee. One of the men who had left came back into the house and struck McPhee in the head. Both men then left.

John McPhee testified that he was sleeping with Rebecca in her bedroom when he was awakened by the sound of running feet in the hallway. He saw Ferraro surrounded by a group of men, one carrying a club and another holding a tire iron. The men were talking to Ferraro. Ferraro was then punched by several of the men, and John jumped into the fight. He was hitting and punching and was being hit and kicked. John was hit by the tire iron across the legs and by a club across the head, a blow which required 12 stitches to close. Eventually, all of the men left except one who was still fighting with him. The man with the club came back into the house and struck him. Both men then departed. John could not identify any of the men with whom he was fighting.

The State then called Matthew Huisel, who was also arrested and charged with home invasion and aggravated battery as a result of the incident. He pleaded guilty to a reduced charge of battery and was placed on probation for 24 months and sentenced to the county jail for six months, serving four months.

On August 30, 1989, Huisel was with a group of men and women, including defendant and Ferraro. Ferraro was given $900 by the group to buy marijuana. He left with the money but did not return.

Most of the group then drove to the Fay residence, believing that was where Ferraro had gone. Defendant had a tire iron, and Jonathan Carter had a stick. Arriving at the Fay residence, Huisel and the others looked through the windows and saw Ferraro.

Several men were let into the Fay residence by the nephew of the owner (Chris Huber); they found Ferraro in the basement. Huisel was the last of the group to enter the home. Ferraro only had some of the money previously given to him, so an argument started. A curly-haired man (McPhee) came out of a bedroom and tackled two of the men in the group, and a fight started. The fight lasted 5 to 10 minutes. They eventually recovered $300 from Ferraro. Huisel did not see defendant hit anyone.

The State sought to use a prior written statement made by Huisel to impeach his testimony. Defendant's objection to the State's use of said statement was overruled. The State then showed Huisel the four-page-long statement that he made to the Carpentersville police the day of his arrest and that he had signed. On page three, he indicated that the curly-haired man (McPhee) was hit on the head by defendant. On page four, Huisel stated that he was not invited into the home by a relative and that he did not think any of the others were invited into the home.

This statement was admitted into evidence by the trial court with no objection by defendant. Over defendant's objection, the trial court allowed the entire four-page statement to be given to the jury during its deliberations.

Testifying on his own behalf, defendant stated that on August 30, 1989, he, along with seven others, went to a Carpentersville residence at about 2 a.m. to find Ferraro and get back money they had given him. He did not know how much money the group had given to Ferraro. Defendant went into the home to get the money, not to beat up anyone who was in the home. They were let into the home by Chris Huber. Defendant had a tire iron with him but did not strike anyone while inside the house. He brought the tire iron to protect himself. When entering the home, he did not break or damage the front door. While defendant was in the hallway, McPhee came out of a bedroom and started punching Jonathan Carter, who carried a wooden stick into the house. McPhee was hit in the head by a wooden stick, but defendant saw no blood on him. Defendant saw no injuries to McPhee.

Defendant was convicted on one count of home invasion and one count of aggravated battery of John McPhee and found not guilty of aggravated battery of Mike Cuniff. The trial court denied defendant's motion for a new trial. Defendant was then sentenced to six years'

imprisonment on the home invasion charge and two years' imprisonment on the aggravated battery charge, the sentences to run concurrently. This timely appeal followed.

We first address defendant's contention that the trial court abused its discretion by submitting to the jury a non-IPI instruction on home invasion.

The trial court gave the jury the following standard IPI instruction on home invasion:

> "A person commits the offense of home invasion when he, not being a police officer acting in the line of duty, without authority, knowingly enters the dwelling place of another when he knows or has reason to know that one or more persons is present, and while armed with a dangerous weapon he uses force or threatens the imminent use of force upon any person within the dwelling place, whether or not injury occurs." Illinois Pattern Jury Instructions, Criminal, No. 11.21 (2d ed. 1981).

Over defendant's objections, the trial court also gave to the jury the following non-IPI instruction regarding home invasion:

> "For purposes of the offense of Home Invasion, an entry into the dwelling in question is unauthorized even when initially invited, when the defendant or one for whose conduct he is legally responsible commits illegal acts within the dwelling."

Supreme Court Rule 451 (134 Ill. 2d R. 451), reads in pertinent part:

> "Whenever Illinois Pattern Jury Instructions, Criminal (2d ed. 1981) (IPI Criminal 2d), contains an instruction applicable in a criminal case, giving due consideration to the facts and the governing law, and the court determines that the jury should be instructed on the subject, the IPI Criminal 2d instruction shall be used, unless the court determines that it does not accurately state the law. Whenever IPI Criminal 2d does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument." 134 Ill. 2d R. 451.

■ Defendant initially argues that the trial court made no finding that the IPI instruction did not accurately state the law which, defendant contends, the court must do under Rule 451. A close review of the record demonstrates that the trial court analogized the case before it to one "where—in a burglary where originally *** the person entered the premises because it was a public place, doors were

open and public was invited in, but once they got in, went in with the intent to steal something, so it made the entry unlawful, even though it was open to the public." So finding, the trial court overruled defendant's objection to the disputed instruction. Given this record, we determine that the trial court did find that, in accordance with Rule 451 (134 Ill. 2d R. 451), the IPI instruction needed the amplification found in the subject non-IPI instruction.

Further, defendant argues that a non-IPI instruction should only be given where there is no IPI instruction which accurately and precisely states the applicable law. (*People v. Haywood* (1980), 82 Ill. 2d 540.) Defendant contends that the IPI instruction was the only appropriate one to be given to the jury regarding home invasion. Defendant further maintains that the non-IPI instruction given was not a settled statement of law and that it directed the jury to find that an authorized entry becomes unauthorized once illegal acts are committed within the dwelling. Thus, defendant concludes that due to this non-IPI instruction, the jury was precluded from finding that the entry was authorized if defendant had no intent to commit illegal acts at the time of entry, or if defendant's intent to commit the illegal acts was formed after a lawful entry.

In support of this argument, defendant cites *People v. Scott* (1982), 108 Ill. App. 3d 607, and *People v. Medreno* (1981), 99 Ill. App. 3d 449. The *Medreno* court held that the offense of home invasion requires proof that upon entry the defendant had the intent of threatening or using force. In *Scott*, the trial court held that home invasion makes criminal the conduct of unauthorized entry of a dwelling for the purpose of threatening or using force. In refusing to follow *People v. Fisher* (1980), 83 Ill. App. 3d 619, the *Scott* court noted that *Fisher* placed heavy reliance on the fact that the defendants entered the victim's apartment with the felonious intent to commit burglary, even though the entry was with the consent of the victim. Thus, the entry was not authorized for the concealed criminal purposes for which the defendants actually came.

Defendant argues that in the instant cause, like *Medreno* and *Scott*, but unlike *Fisher*, there was no felonious intent or concealed purpose by the defendant at the time of entry; he was there simply to get the money back from Ferraro, conduct which is not a crime. It was only after McPhee came out of the bedroom and started the fight that the victims were struck. Defendant contends this intent to use force clearly occurred after the defendant's authorized entry and not at the time of entry.

In response, the State maintains that the IPI instruction fails to cover the instant situation, wherein defendant was originally invited into the residence but, when he began committing illegal acts within said dwelling, the authority to enter was essentially vitiated. In support of this argument, the State primarily relies on *People v. Sanders* (1984), 129 Ill. App. 3d 552, in which the trial court concluded that the statutory phrase "without authority" found both in the burglary and home invasion statutes should have the same meaning. In *Sanders*, a codefendant was given permission to enter the victims' home for the purpose of spending the night. However, the reviewing court held that the codefendant exceeded this authority when he admitted defendant and other assailants for the purpose of robbing said victims. Consequently, the *Sanders* court found the consent for the entry was vitiated. In so finding, it distinguished the above-cited case of *People v. Scott* (1982), 108 Ill. App. 3d 607, relied upon by defendant, by observing that in *Scott* the defendant's acquittal on the burglary charge removed the intent necessary to convict for home invasion.

The State further cites *People v. Hudson* (1983), 113 Ill. App. 3d 1041, wherein the authorization given to defendant and his friends to enter was limited to the purpose of a social visit, and once that authority was exceeded by their assault upon the owner, the consent for the entry was vitiated.

The State also cites *People v. Davis* (1988), 173 Ill. App. 3d 300. In *Davis*, the court relied upon *Hudson* and *People v. Strong* (1984), 129 Ill. App. 3d 427, and held that it was immaterial that the victim may have let the two assailants into his home. The important factor is that they exceeded any possible original authority granted to them when they terrorized Willis and his family. Thus, the *Davis* court concluded that defendants were properly found guilty of home invasion.

In *People v. Haywood* (1980), 82 Ill. 2d 540, a case involving a nonpattern jury instruction on the defense of involuntary intoxication, given over defendant's objection, our supreme court wrote:

"Instructions found in IPI were drafted with the goal of sharply reducing the number of cases in which jury verdicts were set aside because of erroneous instructions. Consequently, each instruction was painstakingly drafted with the use of simple, brief and unslanted language so as to clearly and concisely state the law. To insure the use of such instructions, this court adopted Rule 451(a), which requires that an instruction in IPI be given where applicable, unless the court determines that the instruction does not accurately state the law. It is axiomatic,

therefore, that the use of additional instructions on a subject already covered by IPI would defeat the goal that all instructions be simple, brief, impartial and free from argument." *Haywood*, 82 Ill. 2d at 545.

In *People v. Davis*, cited above by the State, defendant argued that the trial court had the duty to draft and give an instruction regarding felony murder which allegedly amplified the relevant IPI instructions. The *Davis* court stated:

"In sum, the defendant is now asking us to supply what the drafting committee and the supreme court, which has passed on this instruction, have not deemed necessary." (*Davis*, 173 Ill. App. 3d at 308.)

The *Davis* court later stated:

"The defendant argues that the instruction is necessary under the peculiar facts of this case. We reject that argument. If it is a necessary instruction in this case, it should be a necessary instruction in all felony-murder cases. *** Neither the drafters of the pattern instructions, nor the supreme court, which has passed on this instruction on a number of occasions, apparently think that the language proposed by the defendant here belongs in the pattern instruction. We are not prepared to encourage a revival of the discredited practice of culling passages from opinions and incorporating them into instructions contrary to the purpose for which the drafting committees on jury instructions were created and to the mandate of Rule 451." 173 Ill. App. 3d at 310.

See also *People v. Matthews* (1984), 126 Ill. App. 3d 710, 714 (the practice of constructing jury instructions from language used by reviewing courts is frowned upon).

▆ Initially, we note that none of the cases cited by the parties deals with a non-IPI instruction regarding home invasion. Thus, we have no direct guidance on this particular issue.

The IPI instruction carefully reflects the statutory definition of home invasion. (Ill. Rev. Stat. 1989, ch. 38, par. 12—11.) Under the statute, entry into the dwelling place must be without authority. Nothing in the statute addresses the concept of vitiating the authority to enter the dwelling place. Accordingly, the drafters of the pattern instructions and our supreme court view the IPI instruction as the one which accurately states the applicable law. Admittedly, several appellate cases have indicated that the consent to enter a dwelling place can be vitiated by subsequent criminal acts committed therein. Nevertheless, we will not use these cases to sanction the subject non-IPI in-

struction, which, as defendant contends, had the potential to confuse the jury regarding the elements of the offense of home invasion. Consequently, we find that the trial court committed reversible error in giving the subject non-IPI instruction to the jury.

Because the other issues raised by defendant may emerge upon retrial, we shall address them. Defendant contends that the trial court committed reversible error by allowing Huisel's unredacted (unaltered) statement to go to the jury. To reiterate, Huisel made and signed a four-page statement to the police on the day the subject offense was committed. Over defendant's objection, the trial court permitted the State to question Huisel about the prior statement. Huisel admitted to telling the police that he saw defendant hit McPhee in the head with a tire iron and that no one had been invited into the Fay residence. These statements conflicted with Huisel's in-court testimony that he did not see defendant hit McPhee and that some of the group had been invited into the Fay residence. Defendant did not object to the statement's admission into evidence but objected to its being physically submitted to the jury during its deliberations. The trial court overruled this objection, and the disputed document was given to the jury.

Defendant contends that only those portions of the statement which related to inconsistencies should have been given to the jury. He maintains that the only inconsistent statement concerned the striking of McPhee. The rest of the statement was either consistent with Huisel's statement or was not the subject of the State's examination. Thus, those segments should have been redacted.

The State primarily relies on *People v. Salazar* (1988), 126 Ill. 2d 424, wherein two prior taped statements were played in their entirety before the jury. Defense counsel had argued that only the inconsistent taped statements should have been played, while the State maintained that the jury should hear both the taped statements in their entirety. The *Salazar* majority appeared to accept the State's theory that the inconsistent portions were admissible as substantive evidence, pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1), while the consistent portions were admissible as reflecting on the witness' credibility. In the appeal at bar, the State asserts that the identical reasoning is applicable here and, thus, *Salazar* completely disposes of this second issue. We do not agree.

*Salazar*'s facts are readily distinguishable. There, the issue was not whether the tapes or transcriptions thereof were to be sent back

with the jury but rather whether said tapes were to be completely played in their entirety for the jury in the courtroom.

■ After reviewing the disputed statement, we find that generally it is consistent with Huisel's in-court testimony. The primary inconsistencies, cited above, concerned whether the entry was authorized and whether defendant hit McPhee with a tire iron. We see no purpose in allowing the jury to see more of Huisel's statement than that which deals with said inconsistencies. Accordingly, upon retrial, only those parts of Huisel's statement which are inconsistent with his in-court testimony are eligible to go back to the jury.

■ Finally, defendant argues the trial court erred in allowing prejudicial evidence to be heard by the jury. Specifically, he maintains that, in a case where no one was charged with a drug offense, evidence of the drug transaction should have been kept from the jury. Defendant further contends that the drug references were irrelevant to the charges against him. The State replies that the drug deal "gone bad" provides motive for the alleged home invasion. We agree. Proof of motive is relevant in a criminal prosecution to show that defendant committed the offense charged, and evidence which demonstrates motive is admissible, even though it may reveal another offense. (*People v. Leaks* (1989), 179 Ill. App. 3d 231.) The retrieval of the money given to Ferraro sheds light on defendant's motive to enter the Fay residence. Upon retrial, the State may make reference to defendant and others giving Ferraro $900 to buy marijuana.

■ Finally, we agree with defendant's contention that the State improperly made reference to Ferraro's testimony in its opening statement. Upon retrial, the State may only refer to Ferraro's testimony if it is definite that he will be called as a witness for the prosecution.

For reasons stated above, we reverse the judgment of the circuit court and remand the cause of action for further proceedings consistent with this opinion.

Reversed and remanded.

GEIGER and BOWMAN, JJ., concur.