THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TER-RANCE STEELE, Defendant-Appellant.

First District (5th Division)    No. 1—92—1935

Opinion filed June 30, 1994.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Brian Clauss, and Michael F. Bonaguro, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Terrance Steele along with Farrell Hall, Ellis Austin, and Kevin Cathey were indicted for the offenses of attempted armed robbery and first-degree murder. After a separate jury trial defendant was found guilty of attempted armed robbery and not guilty of first-degree murder. The trial court sentenced defendant to four years' probation and 250 hours of community service. A timely notice of appeal was filed.

In requesting that this court reverse his conviction and remand for a new trial, defendant alleges two errors: (1) the trial court improperly admitted into evidence unnecessary details of other crimes; and (2) the trial court improperly admitted into evidence portions of codefendant Farrell Hall's post-arrest statement on the charged offense.

Prior to defendant's trial, two of the codefendants pled guilty to the charges and the third codefendant was found not guilty of first-degree murder and guilty of attempted armed robbery in a trial. Prior to jury selection defense counsel moved to exclude the evidence of the other robberies. The court reserved ruling on this matter.

Thelma Jasper testified that the victim was her son, Derrick Hall. On October 4, 1989, prior to being shot, Derrick was at his mother's house near Division and Pulaski Streets in Chicago, Illinois. Derrick left her house to go home between 9 and 9:30 p.m. Derrick was to take the Division Street bus to Western Avenue, and the Western Avenue bus south to his home on Lexington Street.

When Derrick left his mother's house that evening, he was wearing a dark blue Starter jacket. Ms. Jasper next saw her son dead at the county morgue. At trial, Ms. Jasper was able to recognize one of the State's exhibits as the jacket her son wore that evening.

Ricardo Vigo testified that on October 4, 1989, at approximately 10 p.m. he was near the intersection of Western Avenue and Thomas Street. He was waiting for his wife to arrive on the bus at that same intersection. While waiting for her, an individual wearing a Starter jacket joined Vigo at the bus stop. After about 5 to 10 minutes, Vigo saw a car at the intersection of Western Avenue and Thomas Street. The car was going east on Thomas Street and then stopped at the intersection. It was a station wagon with brown and beige trim, and four people inside. The car turned south on Western Avenue and stopped a few feet from the corner.

The car was double-parked when a man jumped from the passenger side behind the driver. This man walked up to the individual who was wearing a Starter jacket. Vigo was only three to four feet away from the two of them. The man from the car pulled a gun out of his jacket and told the individual to take off the jacket. Vigo then stated that, "somewhere along the line he shot him" as Vigo was standing there. After being shot, the victim walked towards Western Avenue. Vigo turned around and saw the gunman get back into the station wagon. The car headed south on Western Avenue. The victim ran into the street and yelled, "Help me I've been shot; I've been shot."

The police arrived on the scene approximately 5 to 10 minutes later. Vigo drove around the neighborhood with the police to try to locate the station wagon, but the car could not be found.

On October 6, 1989, Vigo viewed a lineup at Area 4 police headquarters. He identified the gunman who shot Derrick Hall.

Farrell Hall testified that he was an inmate at the Menard facility of the Illinois Department of Corrections pursuant to a sentence of 40 years for first-degree murder and attempted robbery. In addition, he was sentenced to a concurrent term of six years for an armed robbery that took place in Bellwood, Illinois. Hall was held in contempt for failing to answer the prosecutor's question as to whether he was with anyone on the evening of October 4, 1989. Hall

acknowledged that he knew defendant and made an in-court identification of him. Hall was held in contempt for failing to answer the prosecutor's question of whether Hall was with defendant on October 4, 1989.

Despite his initial failure to state whether he was with anyone, Hall went on to testify that he rode around in a green and beige station wagon with Kevin Cathey and Ellis Austin on the evening of October 4, 1989. He testified that he did not know who owned the car. Hall was held in contempt of court again for failing to answer the prosecutor's question regarding how many people were in that car on October 4, 1989. Hall admitted that he, Cathey and Austin were on Western Avenue near Thomas Street that evening. Hall again was held in contempt of court for refusing to answer the prosecutor's question of whether defendant was with them on that evening.

Hall testified that he got out of the car with a loaded handgun. Hall approached a black man and told him to hand over his Chicago Bears jacket. As the victim took off his jacket, he began to run away. Hall shot the victim once. The victim fell to the ground, and Hall got back into the car. Hall was held in contempt for failing to answer the prosecutor's question whether defendant was with him at the time of the shooting.

Hall further testified that on that same night, he was with Austin and Cathey in Bellwood. He testified that he did not recall whether defendant was with them. Hall did not recall taking a white jacket from anyone while in Bellwood.

Hall testified that on the same evening he was in Maywood in a car with Cathey and Austin. He testified that he knew that while he was in Maywood a man was robbed of a Redskins jacket. He testified that he did not recall who took the jacket. During the early morning hours of October 6, 1989, Hall appeared in a lineup. That same morning, he gave a court-reported statement to an assistant State's Attorney.

Hall's statement to the assistant State's Attorney was that "Terry" was driving the car that evening, and that "Terry" wanted to rob somebody else. However, Hall did not remember saying that "Terry" was driving, that "Terry" double-parked the car or that "Terry" received a Cincinnati jacket.

Hall reviewed another statement and did not remember signing it. He further testified that not all of the facts in that statement were true. The statement indicated that on October 4, 1989, at approximately 7:30 p.m., Farrell Hall, defendant, Cathey, and Austin went to Maywood to rob people of their jackets. However, Hall denied the

truth of the statement. Hall testified that he, Austin and Cathey went to Maywood, but that he did not remember defendant being there.

Hall reviewed a third statement, but did not remember whether he signed it. That statement also indicated that defendant, along with Hall, Cathey and Austin, took a Redskins jacket and cap from a victim at gunpoint. Hall testified that he did not know where defendant was at the time.

Gaspar Rios testified that on the evening of October 4, 1989, he and a relative returned a video to Hi-Fi Video located at Augusta and Western Avenues (about one block away from Thomas Street). Rios was westbound on Augusta about three cars away from the light when his relative got out of the car to return the tape. As the light changed, he drove to the northwest corner of the intersection. He stepped out of his car to smoke a cigarette while he waited for his relative.

As he smoked his cigarette, he noticed a station wagon driving southbound on Western Avenue near Thomas Street about three quarters of a block from where he was standing. Western Avenue was a well-lighted area. As Rios continued to watch the station wagon, he noticed two black men jump out of the rear passenger side of the car while two people remained in the car. Rios was standing on the opposite side of the street from the same car and began to walk north towards it. One of the men who got out of the car walked toward a black man standing at the bus stop.

Rios testified that the man from the car grabbed the other man's Chicago Bears jacket. The man with the Chicago Bears jacket started to run away. As he did so, the man who approached him shot him. The man with the Chicago Bears jacket fell in the middle of the street. Then, the man who shot him ran back to the car and got inside of it. The car proceeded southbound on Western Avenue towards Rios. As Rios started to walk southbound, he stood parallel to a light post so he would not be seen. As the car passed him, he saw the driver, the rear license plate, and that there were four people in the car. After the car passed him, it made a right turn in a westbound direction on Augusta. Rios got a good look at the driver because the driver looked to his left before making a right-hand turn. Rios looked at the driver for five to seven seconds.

When the police arrived on the scene, Rios described the station wagon as dark blue in color, with beige, tan-like trim. He also informed the police that the license plate was either GY 8152 or GY 7152. Rios identified a photograph of the car at trial. Rios viewed a lineup on October 17, 1989. He identified defendant as the driver of

the car. Rios further made an in-court identification of defendant as the driver of the car.

Rosemary Giambal testified that at the time of the trial she had been a Chicago police officer for almost four years. On October 4, 1989, she was assigned to a shooting at 1104 North Western Avenue in Chicago, Illinois. When she and her partner arrived at the scene, Officer Giambal saw the victim lying on the ground. The victim was wearing a blue Starter jacket. Officer Giambal testified that Rios was talking to her sergeant. Officer Giambal was present when Rios told her sergeant that one of the men in the car got out, approached the victim, told him to remove his jacket, and then shot the victim in the back. Rios also told the sergeant the license plate number.

Police officer Hoffman testified that he was assigned to investigate a homicide on October 5, 1989. He investigated the license plate GY 8152 and found that it was registered to Donna Steele. After speaking to Donna Steele, Officer Hoffman acquired information which led him to believe he could locate the car and defendant at a particular lumber store. A station wagon bearing the license plate GY 8152 was found in the parking lot. However, defendant was not at the store.

When Officer Hoffman returned to the station, he received two calls from defendant's uncle, whose name was also Terry Steele. Defendant's uncle stated that defendant was driving the car on October 4, 1989. After Officer Hoffman talked to defendant's uncle the second time, he acquired information that helped him identify the other suspects. Specifically, he had the names Austin, Farrell, and Cathey. He learned that they could be found on the 5500 block of West Haddon Avenue. Officer Hoffman placed Austin under arrest upon arrival. After defense counsel asked how many robberies the other three individuals were charged with, the State objected. At a sidebar, the prosecutor stated that Hall and Austin were charged with the Bellwood robbery. With regard to the Maywood robbery, the only two persons charged were Austin and Cathey.

Detective Jay Diamond testified that he was assigned to investigate the homicide of Derrick Hall on October 5, 1989. Detectives Williams and Stack were also assigned to the investigation. According to Diamond's testimony, Detective Williams made a phone call to defendant's uncle, who was also a Chicago police officer, on October 5, 1989. After Detective Williams spoke to defendant's uncle, Detectives Williams, Stack and Diamond proceeded to 5500 West Haddon Avenue. They were looking for Austin, Hall, and Cathey. When they arrived at that address, they met Officer Hoffman, who already had Austin in custody.

After Officer Hoffman told Detective Diamond what Austin said

to him, the detectives went to 5509 West Haddon Avenue to locate Hall. However, they did not find him there. After speaking with Hall's mother, they drove to the Golf Mill shopping center to locate Hall and Cathey. The detectives first went to a fast-food restaurant to find Hall and Cathey. The detectives then went outside the shopping center to the bus stop. They approached an individual who identified himself as Kevin Cathey. Detective Diamond placed Cathey under arrest and recovered a .32-caliber revolver from Cathey which was loaded with two live rounds. At the time of the arrest, Cathey was wearing a Redskins Starter jacket and Redskins baseball cap. When they arrived back at Area 4 with Cathey, Hall was in custody. Austin was also in custody at Area 4.

At approximately 12:30 a.m. on October 6, 1989, Ricardo Vigo viewed a lineup that contained Hall and Cathey. Vigo identified Farrell Hall in the lineup. After the lineup, all three of the detectives had conversations with Austin, Hall and Cathey. Following those conversations, the detectives began to look for defendant.

On October 17, 1989, at 4:30 p.m., Detective Diamond was assigned to assist Detective Wright, who had placed defendant under arrest. Detective Diamond made an in-court identification of defendant. Detective Diamond testified that following defendant's arrest he and Detective Wright contacted Gaspar Rios for the purpose of viewing a lineup. Diamond testified that Rios identified defendant from the lineup.

Both parties stipulated that if Dr. Eupil Choi were called, he would testify that he was a licensed medical doctor and an assistant medical examiner employed by the Cook County medical examiner's office. On October 5, 1989, he conducted an autopsy on the body of Derrick Hall. Pursuant to Dr. Choi's external examination, he noted a single gunshot wound located in the middle of the victim's body. After conducting an internal examination of the victim's body, Dr. Choi found that the bullet entered the victim's back and went toward the front of his body, piercing the victim's lungs. Dr. Choi would further testify, in his opinion, that the victim died as a result of a gunshot wound to the back.

Both parties also stipulated that, if called, Richard Chenow would testify that he had been a Chicago police officer and a firearms examiner for over 20 years. In his opinion, the bullet recovered from the victim's body was fired from the .32 revolver recovered from Cathey.

Assistant State's Attorney Ricardo Correa testified that on December 6, 1986, while on felony review, he was assigned to assist the police in the investigation of a homicide. Pursuant to that

assignment, he went to Area 4, where he initially spoke to Detective Williams.

At 3:30 a.m., Correa spoke to Farrell Hall. Correa informed Hall that he was an assistant State's Attorney and advised him of his *Miranda* rights.

Correa spoke to Hall regarding the shooting of Derrick Hall on October 4, 1989. Hall agreed to give a court-reported statement. Hall answered Correa's questions in the presence of a court reporter. The court reporter typed up the statement of Hall and gave it to Correa. After Correa read through Hall's statement, he asked Hall to do the same. Hall then read through the statement, made corrections and signed the statement.

On October 5, 1989, Correa had another conversation with Hall. Hall explained the events of armed robberies that occurred in Maywood and Bellwood. Correa prepared a handwritten statement of the conversations with him regarding those armed robberies. Correa gave Hall the statements concerning the armed robberies in Bellwood and Maywood. Correa testified that Hall read each statement for accuracy and signed each statement.

Over objection by the defense, Hall's statements were published to the jury. The initial court-reported statement of Hall indicated that on October 4, 1989, at approximately 7 p.m., Cathey, defendant, Austin and Hall went out to rob people of their jackets. Austin was carrying a .32 revolver. At approximately 10 p.m., they were in the vicinity of Thomas Street and Western Avenue. Before driving on Western Avenue, they were on Thomas Street. Defendant was driving the car. There was a man wearing a Bears jacket running down Western Avenue towards the bus stop at Thomas Street. Defendant double-parked the car and Austin gave Hall the gun. Hall got out of the car, walked towards the victim, pointed the gun at him and said, "Give me your jacket." The victim started to run and Hall shot him. In the statement Hall said, "I shot for his legs, but I don't know where else." Hall ran back to the car and went home.

Hall stated that he found the gun on Central and Division Streets. Two bullets were previously fired from the gun. One was fired from the gun when Hall found it, to see if it worked, and Austin used it to shoot somebody in the leg in Maywood.

The court-reported statement of Hall further stated that after Hall shot the victim, defendant said, "Who you all want to get now. Do you all want to rob somebody else[?]" The four divided up everything that they had robbed people of during that night at Hall's house.

Hall made another statement on October 6, 1989, regarding the

armed robbery in Maywood which occurred on October 4, 1989, at 7:30 p.m. That statement indicated that while in Maywood, Austin and Hall approached a victim and demanded his jacket. Austin pulled out a gun while Hall took the victim's jacket, headphones, and beeper.

Hall gave a third statement on October 6, 1989, regarding another armed robbery which occurred on October 4, 1989, in Maywood. At approximately 8 p.m., Cathey and Austin stepped out of the car and took a Redskins jacket and cap at gunpoint. When doing so, Austin fired a shot with a .32-caliber revolver.

Lionel Gilmer testified that on October 4, 1989, he left work at approximately 7:15 p.m. Gilmer started to walk eastbound on St. Charles Road. He was wearing a red and white leather Task Force jacket. While walking home at about 8 p.m., he was near 27th and St. Charles Road in Bellwood when two people approached him. One of them had a silver revolver. Gilmer testified that the person with the revolver "pointed the gun towards me and told me to give up my shit." So Gilmer gave the robber his leather jacket, Walkman, pager and $300. After they took these items, the two men ran into the alley behind St. Charles Road and to a car that was waiting in the alley. They got into the car and sped off. Gilmer testified that the car was a late model station wagon with green panels. He also testified that it looked like there were two other people in the car. Gilmer continued to walk eastbound on St. Charles to a gas station where he called the police. He told the police what happened. The next day, the Bellwood police called Gilmer and he went to the police station to view a lineup. He identified Austin and Hall as the two people who robbed him.

Stephen White testified that on October 4, 1989, at 8:30 p.m., he walked his ex-girl friend to the bus stop on 5th Avenue and Roosevelt Road. He then walked down 5th Avenue to Fillmore, turned left, and walked on the right side of the street. While on Fillmore between 6th and 7th Avenues, two people approached White. White saw one of them reach into a pocket, so he started to run. As White did so, the man pointed a gun at him and fired one shot. White stopped running, and the men approached him. The person with the gun put it into his face and told him to take off his coat. White handed over his Redskins Starter jacket and NFL hat. The robbers then went around the corner but he did not see where they went. White went to a friend's house to call the police. On October 6, 1989, he identified the two men, Cathey and Austin, from a lineup as the men who took his jacket and hat.

Defendant's uncle, who has the same name as defendant, testified that he had been a Chicago police officer for 20 years. On October 5,

1989, Steele received a phone call at 11 a.m. from a detective at Area 4 police headquarters. The detective asked Steele if he knew Donna Steele. The detective stated that she was his ex-sister-in-law. The detective informed Steele that Donna's car was involved in a shooting. Steele then called his brother to find out if defendant had been driving the car. A family friend told Steele that defendant was working at a Handy Andy. Steele drove there and met with defendant. After they started to have a conversation about the night before, defendant began to cry. They went together to defendant's grandfather's house, where they further discussed the prior evening. Steele testified that defendant answered all his questions and subsequently turned himself in.

Steele further testified that the first time he heard the names Farrell Hall, Kevin Cathey and Ellis Austin was on October 5, 1989. Steele informed the police of their names and information about defendant.

Defendant testified that on October 4, 1989, he was living with his mother, Donna Steele. On that day, he drove to Austin's house after work. Defendant and Austin dropped off Austin's girl friend. On the way back to Austin's house, Austin saw two of his friends. Defendant testified that he pulled over, and Austin got out of the car. Austin then returned to the car with his two friends. Defendant had never met Austin's two friends. They all drove to Maywood to see some of defendant's girl friends. Farrell Hall then asked if defendant could stop the car, but Hall did not say why and defendant did not ask. Hall and Cathey got out of the car. Hall walked around the corner out of sight. Both Hall and Cathey returned to the rear passenger seat of the car.

Austin requested that defendant again stop the car in Maywood around 6th or 7th Street. Austin and Hall got out of the car and returned about five to six minutes later. When they got back into the car, defendant saw a jacket in Hall's hand. Defendant decided not to go to his girl friend's house because he was suspicious that something was wrong. Defendant then started to drive home. Either Hall or Cathey asked defendant to turn off onto Western Avenue. As they were driving on Western Avenue, Hall asked defendant to drive around the corner. Defendant made a left turn and drove east on Thomas Street. When defendant stopped at the corner, Hall asked defendant to pull around the corner. After defendant did so, Hall stated, "Don't go anywhere, I'll be right back." Hall got out of the car, walked behind the car, and walked north on Western Avenue. When Hall returned to the car, defendant drove south on Western Avenue and turned west onto Augusta Boulevard. When Hall returned to the car, he did not have a jacket with him.

Defendant testified that he was afraid of what Austin's friends might have done to him if he did not do what they said. Defendant testified that he did not know at any time that anyone in the car had a gun. Further, defendant denied ever saying that he wanted to rob someone else or get more jackets. In addition, he denied ever being given a jacket, beeper, money, or headphone radio by any of the three passengers. Defendant further stated that he never intended to hurt or rob anyone. He learned the next day from his uncle that one of them had a gun. Defendant surrendered himself to the police on October 17, 1989, having learned that someone was shot and killed.

Defendant's motion for a new trial was denied.

Defendant's first argument on appeal is that the trial court improperly admitted into evidence unnecessary details of other crimes which occurred shortly before the instant offense. Defendant concedes that he failed to include this error in the post-trial motion for new trial but would have this court review the issue under the doctrine of plain error. We are not persuaded that any error so affected substantial rights as to rise to the level of plain error.

The general rule is that evidence of crimes other than the one for which the accused is being tried is not admissible. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) However, one of numerous exceptions is triggered where evidence goes towards showing motive, intent, identity, absence of mistake or *modus operandi*. (*McDonald*, 62 Ill. 2d 448, 343 N.E.2d 489.) Similarly, evidence of other criminal offenses is admissible to show, by similar acts or incidents, that the offense charged was not inadvertent, accidental, unintentional or committed without guilty knowledge. (*People v. Calhoun* (1984), 126 Ill. App. 3d 727, 736, 467 N.E.2d 1037, citing *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) Evidence of other crimes admitted for one of the above purposes should be strictly limited to what is necessary to satisfy that purpose. Such limitation avoids prejudice. (*People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174.) "In determining the admissibility of evidence which informs a jury of a crime independent of or disconnected from the offense with which an accused has been charged, it is necessary to weigh the probative value and strength of such evidence against its probable prejudicial effects." *People v. Diaz* (1979), 78 Ill. App. 3d 277, 280, 397 N.E.2d 148, 150, citing *People v. Oliver* (1977), 50 Ill. App. 3d 665, 365 N.E.2d 618.

●1 Defendant's reliance on *Diaz*, where the reviewing court found that the State improperly introduced detailed evidence of an offense unrelated to the crime charged, is misplaced. In that case the unrelated offense was an armed robbery attempt by the defendant and

another man. The victim was a pregnant woman. The other man warned the victim that if she did not want the baby "born with a hole in its head," she should go along. The introduction of the woman's physical condition and the specific threats used were unnecessary details that prevented defendant from obtaining a fair trial. In the case at bar, unlike in *Diaz*, the prejudicial effect of the testimony concerning other offenses is not "obvious" nor was it "offered only to inflame the jury against defendant." (*Diaz*, 78 Ill. App. 3d at 280, 397 N.E.2d at 150.) Rather, in the case at bar, evidence of the previous robberies shed light on defendant's *modus operandi*, intent, and identity. While the State does not allege that defendant personally attempted to rob or shoot the victim, it alleges he is criminally accountable for the shooter's actions. In order to establish defendant's accountability, the State must prove defendant's intent to promote or facilitate the commission of the substantive crime by either soliciting, aiding, abetting, agreeing or attempting to aid the actual perpetrators. (720 ILCS 5/5—2 (West 1992).) For this reason the trial court properly admitted testimony regarding all three robberies.

We now turn to the issue whether the trial court, as defendant contends, improperly admitted into evidence portions of codefendant Farrell Hall's post-arrest statement on the charged offense where those portions were consistent with Hall's trial testimony. Again defendant concedes that he failed to include this error in the post-trial motion for new trial and asks this court to review the issue under the doctrine of plain error. We must determine whether any error so affected substantial rights as to rise to the level of plain error.

We note at the outset that a reviewing court will not substitute its opinion for the trial court's on this issue and will only reverse a trial court's decision where it has abused its discretion. (*People v. Salazar* (1988), 126 Ill. 2d 424, 535 N.E.2d 766.) Defendant relies on *People v. Bush* (1992), 227 Ill. App. 3d 81, 590 N.E.2d 984, for the proposition that only those portions of a witness' statement at the time of his arrest which are inconsistent with his trial testimony are eligible to be presented to the jury under section 115—10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 1992).) That provision states, in pertinent part:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding." 725 ILCS 5/115—10.1 (West 1992).

The general rule precludes admission of a witness' prior consistent statement. (*People v. Borges* (1984), 127 Ill. App. 3d 597, 469 N.E.2d 321.) In *Bush* the reviewing court remanded the case for retrial determining that the consistent segments of the prior statement should have been redacted.

*Salazar* made it clear that the admissibility of a statement based on the above-quoted statute "does not require a certain minimal amount of inconsistencies." (*Salazar*, 126 Ill. 2d at 457, 535 N.E.2d at 780.) There the Illinois Supreme Court observed that "The General Assembly *** provided for the circuit court to have discretion in determining whether or not the testimony is inconsistent with a prior statement. *** It is for the circuit court to determine the issue." 126 Ill. 2d at 458.

●2 Hall's court-reported statement recorded prior to trial detailed defendant's participation in the offense charged and indicated that after the offenses occurred defendant asked, "So who you all want to get now. Do you all want to rob somebody else?" At trial Hall testified that he could not recall whether defendant was present at all on the night in question. The significant inconsistencies persuade us that the trial court did not err when it admitted Hall's previous statements into evidence even though some of his previous statements were also consistent with his testimony at trial.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

MURRAY, P.J., and COUSINS, J., concur.